## THE STATE v. J. E. BOBBITT, Appellant.

Division Two, December 15, 1908.

1. BILL OF EXCEPTIONS: Special Judge: Signing After End of Term. The regular judge of another circuit who because of the sickness of the regular judge has been called in "to hold the remainder of the term," has authority after the expiration of that term, to extend, in vacation, the time ror filing the bill of exceptions, and to sign and allow said bill. He does not lose his jurisdiction to sign the bill simply because the term at which the case was tried has expired.

2. **MURDER: In Perpetration of Arson: Trial for Second-Degree Murder.** Because the statute makes a homicide committed in the perpetration of arson murder in the first degree only, and because the evidence shows if anything that the homicide was committed in the perpetration of arson, is no reason why the State cannot elect to prosecute for murder in the second degree, and no reason why the jury cannot convict the defendant of that offense. In any case, under an information charging murder in the first degree, the defendant, although the evidence shows him to be guilty of murder in that degree or not guilty at all, may be convicted of murder in the second degree.

3. ———: ———: **Distinct Offense.** A homicide committed in the perpetration of arson is not a distinct offense. It is only one of the methods by which murder in the first degree may be committed.

4. ———: ———: **Classification.** The statutes dividing murder into two degrees is a statute of classification, not of distinction. In murder committed in the perpetration of arson there may be a lower grade of homicide than murder in the first degree.

5. ———: **Conspiracy to Burn House: Absent Conspirator.** Where there is much evidence tending to show that defendant was the instigator of a conspiracy to burn the house of deceased, and a homicide was committed in the course of the perpetration of that offense and in carrying out that conspiracy, defendant, though not personally present when the arson was attempted and the homicide was committed, is as much guilty of the homicide as he would have been had he been personally present and fired the shot.

6. ———: **Instruction for First Degree: Conviction of Second Degree.** Notwithstanding the court required the jury to find facts which amount to murder in the first degree and instructed them that if they so found they could nevertheless convict defendant only of murder in the second degree, the instruction is not reversible error. If error at all, it was a favor to defendant and not to his injury, and he cannot complain.

7. ———: **Instruction: Definition of Non-Constituent Elements.** Where the jury were not required to find deliberation or premeditation or malice aforethought, it was not error to define wilfully, feloniously, premeditatedly and malice aforethought, since defendant was in no manner injured thereby.

8. **INSTRUCTION: Corroboration: Not Defined.** It is not necessary to define the word "corroborate" used in the usual instruction concerning the weight to be given to the testimony of an accomplice and the caution with which his testimony is to be received.

9. ————: Testimony Under Promise of Immunity. It is not error to refuse an instruction that if any of the witnesses for the prosecution were induced or influenced to become witnesses and testify by any promise or intimation of immunity from punishment, their testimony should be received with great caution, and the jury should take such facts into consideration. The instruction is a comment on the testimony, and the point is sufficiently covered by the usual instruction on the weight of the evidence and the credibility of the witnesses.

10. ————: Circumstantial Evidence. Where the killing and defendant's connection therewith were shown by direct and positive testimony, and the State did not seek to convict him upon circumstantial evidence alone, or upon evidence principally circumstantial, it is not error to refuse an instruction on circumstantial evidence.

11. ————: Motive. Where there is evidence of motive, an instruction to the effect that the absence of any probable motive for the commission of the crime is a circumstance which must be considered in favor of the defendant, should be refused

12. JUROR: Challenge. The defendant should challenge an objectionable juror for cause at the time of his *voir dire* examination and state the ground of his challenge. It is too late to state for the first time the ground on appeal; and a mere challenge in the words, "We challenge this juror," or a general challenge of certain jurors who had read newspaper accounts of the trial, without specifying any grounds of disqualification, is the same as no challenge at all.

13. ————: Qualification: Newspaper Reports. A person otherwise qualified to sit as a juror in a criminal case is not disqualified by reason of having formed an opinion as to the guilt or innocence of the accused from reading fragmentary newspaper accounts of a confession or statement made by one of the conspirators who testifies in the case, if he states on his *voir dire* that he can and will give the defendant a fair and impartial trial, notwithstanding such opinion.

Appeal from Howard Circuit Court.—*Hon. Samuel Davis*, Special Judge.

AFFIRMED.

*O. S. Barton* and *Sam C. Major* for appellant.

(1) Defendant was entitled to a speedy public trial by an impartial jury. He was entitled to a full panel of qualified jurors before he should have been

required to make his peremptory challenges. Men who have formed an opinion from talking with witnesses or from reading the sworn evidence taken before the coroner or preliminary examination are just as ready to declare their ability to discard them and render a verdict solely on the evidence as those who have only read newspaper reports, but experience has taught the danger of confiding to them the issues of life or liberty. The juror Wayland formed his opinion from reading the evidence given before the coroner's jury. And the juror Yancey stated he had formed an opinion from what he had read in the newspapers, the coroner's inquest, confession, and rumor. State v. Foley, 144 Mo. 600; State v. Walton, 74 Mo. 284; State v. Culler, 82 Mo. 623; State v. Hultz, 106 Mo. 41; State v. Robinson, 117 Mo. 649. (2) The trial court should have sustained the objection made by defendant to the admission of any evidence of a conspiracy in this case, for the reason that no conspiracy was alleged in the indictment. Where the indictment does not charge a conspiracy, evidence of a conspiracy is not admissible, for unless a conspiracy is charged then the defendant is not prepared to meet evidence of a conspiracy. State v. Kennedy, 177 Mo. 98; R. S. 1899, sec. 2632; State v. Carroll, 31 La. Ann. 860. And especially should the objection be sustained as to any evidence as to anything said or done by Joe Stewart for he was not jointly indicted with this defendant. R. S. 1899, sec. 2632; State v. Kennedy, 177 Mo. 96. (3) The court should have given the first instruction asked by defendant at the close of the evidence of the State, in the nature of a demurrer to the evidence. There was not sufficient evidence to connect defendant with the crime. The State having elected to prosecute for murder in the second degree and then proceeding on the theory of murder committed in the perpetration or the attempt to perpetrate arson, which

is murder in the first degree, defendant could not have been found guilty of murder in the second degree under the law and the evidence. Secs. 1815, 1816, R. S. 1899; People v. Sanchez, 24 Cal. 17. (4) To hold one criminally responsible for a homicide committed by another there must have been a conspiracy or concert between them, and the deed must have been done within the common design or purpose. State v. Kennedy, 177 Mo. 98; Wharton on Homicide (3 Ed.), secs. 423, 427; Kerr on Hom., sec. 38; Chapman v. State, 43 Tex. Crim. 328; Kirby v. State, 23 Tex. App. 13; Burrell v. State, 18 Tex. 713; State v. Cannon, 49 S. C. 550. There was no evidence of a conspiracy to kill Franklin Smith. (5) The court erred in giving instruction B. This instruction does not declare the law. It does not define murder in the second degree nor does it define any offense except murder in the first degree. As to this charge the State had dismissed and elected to prosecute for murder in the second degree. State v. Edwards, 203 Mo. 543. (6) The trial court failed to explain to the jury the meaning of the word "corroborate." The words "corroborate" and "corroboration" should not be used in an instruction without explaining their meaning. State v. Hunter, 181 Mo. 316. An instruction in regard to the corroboration of the testimony of an accomplice by that of other credible witnesses which fails to explain to the jury the meaning of the word "corroborated" is erroneous. State v. Claigle, 92 Mo. 395; State v. McLain, 159 Mo. 340; State v. Sprague, 149 Mo. 409; State v. Milles, 100 Mo. 606. (7) The evidence introduced showed conclusively that the witnesses Kivett and Peacher were present and participated in, if they were not the sole perpetrators of, the offense. The evidence also shows that no charge whatever has been preferred against Kivett, while the only charge preferred against Peacher is a charge of arson and his punishment fixed at a term

of three years in the reform school. These facts were sufficient to go to the jury, and should have been submitted under proper instructions for the purposes asked in this instruction. (8) Instruction 12, asked by defendant, should have been given. While a want of motive is no excuse for a crime when a crime is clearly established, yet, in a case depending mainly on circumstantial evidence, the want of a motive is an important consideration bearing upon the probability of guilt. State v. Heusack, 189 Mo. 306; State v. Francis, 199 Mo. 687; State v. David, 131 Mo. 380; State v. Gordon, 199 Mo. 582; State v. Foley, 144 Mo. 630; State v. Bungton, 198 Mo. 23.

*Herbert S. Hadley,* Attorney-General, and *F. G. Ferris,* Assistant Attorney-General, for the State; *A. W. Walker* of counsel.

(1) There is nothing before this court for review except the record proper. Secs. 731, 1678, R. S. 1899; Viertel v. Viertel, 212 Mo. 562. (2) A homicide committed in the perpetration of arson is not a distinct offense, but is only one of the methods by which murder in the first degree may be committed. An indictment for murder in the first degree includes murder in the second degree, and the proscuting attorney may elect to prosecute for murder in the second degree in all cases of indictment for murder in the first degree. Under such an indictment any method of killing may be proved, and the jury has power to return a verdict of guilty of murder in the second degree, and such verdict stands, although the evidence shows murder in the first degree strictly. Sec. 1815, R. S. 1899; State v. Myers, 99 Mo. 113; 1 Wharton's Crim. Law, sec. 393; Kelley's Crim. Law and Pr. (2 Ed.), sec. 486, p. 321; State v. Moxlev, 115 Mo. 651; State v. Schieller, 130 Mo. 516. This rule applies to all cases of murder in the first degree. The case of homicide committed

in the perpetration of arson is not excepted from the rule, and in such case the jury have the power to return a verdict of guilty of murder in the second degree. R. S. 1899, secs. 1817, 2369, 2535; State v. Greer, 11 Wash. 244; State v. Howard, 33 Wash. 260; Lane v. Com., 59 Pa. St. 371; State v. Wagner, 78 Mo. 644; State v. Phinney, 13 Idaho 307. The prosecuting attorney has the right, at his option, at any time before or during the trial, to enter a *nolle* as to murder in the first degree, and elect to try defendant for murder in the second degree. And, as it is competent for the State to strike off from the charge of guilt a higher and more aggravated portion of the crime, and to prosecute for a lesser degree of criminality, so it is competent also for the court properly to instruct as to such lower degree. State v. Schieller, 130 Mo. 516; State v. Frazier, 137 Mo. 340; State v. Talmage, 107 Mo. 549; State v. Feeley, 194 Mo. 323. In the trial of a case, under an indictment charging murder in the first degree, when there is no evidence tending to prove murder in the second degree, an instruction as to murder in the second degree should not be given, but, under our statute (R. S. 1899, sec. 2369), if given, it is not such error as will warrant a reversal of the judgment of the court. It is an error in defendant's favor, of which he has no cause to complain. State v. West, 202 Mo. 139; State v. Nelson, 88 Mo. 126; State v. Wagner, 78 Mo. 644; Johnson v. State, 44 Tex. Crim. 335; State v. Todd, 194 Mo. 394; State v. Billings, 140 Mo. 205; 1 Bishop's New Crim. Proc. (4 Ed.), sec. 980, p. 606; Wharton on Homicide (3 Ed.), 250. A defendant convicted of murder in the second degree is in no position to complain of an instruction in respect to murder in the first degree. State v. Darling, 199 Mo. 202; State v. Riddle, 179 Mo. 298. (3) The motion for a new trial does not give the names of jurors respecting whom the trial court is

alleged to have erred in refusing to sustain defendant's challenges. The court, not being informed as to what jurors defendant intended to embrace in the motion, will disregard such assignment of error on appeal. State v. Thomasitz, 144 Mo. 91; State v. Hottman, 196 Mo. 126. Such an objection as "We challenge this juror" amounts to no more than a general objection. No one of these challenges is sufficient to preserve the error complained of for review by this court. Nothing is better settled than that challenges for cause must be specifically stated. The particular cause must be set forth. State v. Taylor, 134 Mo. 142; State v. Myers, 198 Mo. 248. "It has always been held under section 2616, Revised Statutes 1899, that a person testifying on his *voir dire* in a criminal cause that he had read newspaper reports of the case and had formed an opinion which it would require evidence to remove, but that he could try the case fairly, is a competent juror." State v. Church, 199 Mo. 631; State v. Myers, 198 Mo. 250; State v. Vickers, 209 Mo. 28. And the question as to the qualification of a juror is one of fact to be found by the trial court from his whole examination, including his demeanor while on the witness stand. All doubts should be resolved in favor of the finding of the trial court, which should not be disturbed unless it is clearly against the evidence. State v. Cunningham, 100 Mo. 382; State v. Sykes, 191 Mo. 76. (4) Defendant complains that, inasmuch as a conspiracy was not alleged in the indictment, evidence of a conspiracy should not have been admitted. "It is well settled that the declarations and admissions of an accomplice in crime, made while the conspiracy exists, are admissible in evidence against an accomplice, and in order to render such evidence admissible, it is not necessary that the information allege that a conspiracy existed." State v. Collins, 181 Mo. 261; State v. Ruck, 194 Mo. 433.

GANTT, J.—On April 4, 1907, at the April term of the circuit court of Howard county, the prosecuting attorney filed the following information in said court:

"*State of Missouri, County of Howard, ss.*

"In the Circuit Court of Howard County, April Term, A. D. 1907.

"Now comes A. W. Walker, prosecuting attorney for the State of Missouri, in and for the body of the county of Howard, and upon his official oath informs the court that J. E. Bobbitt, Robert Goodwin and Everett Bobbitt, on the 19th day of March, 1907, at the county of Howard, State of Missouri, in and upon one Franklin Smith then and there being, feloniously, willfully, deliberately, premeditatedly, on purpose and of their malice aforethought did make an assault; and a certain revolving pistol which was then and there loaded with gunpowder and leaden bullets, and by them, the said J. E. Bobbitt, Robert Goodwin and Everett Bobbitt in their hands then and there had and held, they the said J. E. Bobbitt, Robert Goodwin and Everett Bobbitt did then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of their malice aforethought, discharge and shoot off, upon and against him, the said Franklin Smith; and him the said Franklin Smith, with the leaden bullets aforesaid out of the pistol aforesaid then and there, by force of the gunpowder aforesaid, by the said J. E. Bobbitt, Robert Goodwin and Everett Bobbitt shot off and discharged as aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of their malice aforethought, did strike, penetrate and wound the said Franklin Smith in and upon the breast and and body of him, the said Franklin Smith, thus and thereby, then and there, feloniously, willfully, deliberately, premeditatedly, on purpose and of their malice aforethought, giving to him, the said Franklin Smith, with the leaden bullets aforesaid, so,

as aforesaid discharged and shot off out of the pistol
aforesaid, by the said J. E. Bobbitt, Robert Goodwin
and Everett Bobbitt, one mortal wound, of which said
mortal wound he, the said Franklin Smith, languished
and languishing did live for the space of five minutes,
of which said mortal wound the said Franklin Smith
on the said 19th day of March, 1907, at the county of
Howard and State of Missouri, died; and so the pros-
ecuting attorney aforesaid upon his official oath afore-
said, doth say, that the said J. E. Bobbitt, Robert
Goodwin and Everett Bobbitt, him the said Franklin
Smith, at the county and State aforesaid, in the man-
ner and by the means aforesaid, feloniously, willfully,
deliberately, premeditatedly, and on purpose and of
their malice aforethought did kill and murder; against
the peace and dignity of the State.

"A. W. WALKER,

"Prosecuting Attorney.

"A. W. Walker, prosecuting attorney of Howard
county, Missouri, makes oath and says that the facts
stated in the above and foregoing information are true
according to his best information and belief.

"A. W. WALKER,

"Subscribed and sworn to before me this 4th day
of April, 1907.

"(L. S.)                    N. F. FRAZIER,

"Clerk of the Circuit Court of Howard County,
Missouri."

On the same day a certified copy of this informa-
tion was delivered to each of the defendants and on
the succeeding day the defendants were duly arraign-
ed and each entered a plea of not guilty, and upon
the application of the defendants, the cause was con-
tinued until the August term.   On the 2nd Monday of
August, 1907, the regular August term of said court,
the Honorable William H. Martin, judge of the Four-
teenth Judicial Circuit presided, by the request of

Judge Waller, the regular judge of the Nineteenth Judicial Circuit, who was at the time sick and unable to hold said term of court. On August 17th, the cause was set down for trial on October 14, 1907. And on October 18, 1907, a *venire* of one hundred jurors was ordered to be summoned. On the 22nd of October, Judge Martin declining to hold the remainder of the said August adjourned term, Judge Samuel C. Davis, the judge of the Fifteenth Judicial Circuit, was requested and called in by Judge Waller to hold the remainder of the said term and appeared on said day and presided in said court in the trial of the said cause. The case was dismissed as to the defendant Everett Bobbitt and a severance was granted to the defendant J. E. Bobbitt, and a separate trial awarded to him. Both parties having announced ready for trial, the prosecuting attorney elected to waive the prosecution of the defendant J. E. Bobbitt for murder in the first degree and to prosecute for murder in the second degree under the information filed in the case, and thereupon the cause proceeded, and on October 25th, the jury found the defendant guilty of murder in the second degree and assessed his punishment at imprisonment in the penitentiary for a term of ten years. On October 26, 1907, the defendant's motions for new trial and in arrest of judgment were filed, heard and overruled and the defendant sentenced in accordance with the verdict. From that sentence the defendant has appealed to this court.

The evidence on the part of the State tended to prove that the defendant owned a farm located about two miles north of the village of Boonsboro in Howard county. The dwelling house on this farm faced to the north. It was a two-story house, having a one-story ell for the kitchen extending southward in the rear. On the west side of the kitchen was a low porch, and near the southwest corner of this porch

was an old log house.    In the months of February
and March, 1907, Franklin Smith with his family
occupied this dwelling house.    Defendant at that
time was living with his son-in-law, Robert Goodwin,
at the edge of the village of Boonsboro.    Smith was
in possession of said farm of defendant under a con-
tract of sale or lease, the terms of which were in
dispute between the defendant and Smith.    Some
time prior to the killing of Smith, the defendant had
instituted a suit in a justice's court for the possession
of the said farm.    On the 16th of February, defend-
ant's son Everett was at Franklin Junction and called
on Rolla Kivett, who resided there, the latter being of
some kin to the defendant's wife.    On the 19th of
February, as testified by Kivett, the defendant went
to Franklin Junction and said to Kivett, ''Rolla, why
didn't you come up last night to burn that house?''
Kivett replied in effect that he had studied where he
and Everett would be put if they did such a thing.
Whereupon, defendant said, ''Oh, they won't try to
do anything if you go.    You come here and do that
and nobody will ever know it but us.    Can you go to-
night?''    Kivett made the same excuse for not go-
ing that night, whereupon defendant told him to hire
a horse that week or next and defendant would pay
all expenses.    Kivett told him that if he took a no-
tion to go he would telephone, and defendant said,
''All right.''    On the 23rd of February, defendant
made another trip to see Kivett and told him that he
wanted to get old man Smith out without having a
lawsuit, and in regard to burning him out said, ''That
is the only way to do, and the sooner it is done the
better it will be.''    Kivett again told him that if he
went he would telephone the defendant so the father
could let his son Everett know about meeting him.

About the last of February, one Saturday fore-
noon in a store at Lisbon, not far from said farm, the

defendant told Will Bodell that if he could not get Smith off of the place without a lawsuit, he would kill him. On the night of the same day, at the same store, defendant told Richard Wills he was going to get old Frank Smith off of his place if he had to kill him and drag him out. William Quinley testified that about the last of February, he, in company with Everett Bobbitt, met the defendant in the road, and upon being asked where he had been, defendant replied, he had been up to Frank Smith's, but did not get to see him and added, "I will see him and if he does not give me possession by the 3rd day of March, they will haul one or the other of us to Boonsboro feet foremost." About that time defendant bought from Walker Brashear an Iver-Johnson 38 hammerless blue-steel revolver. About the first of March, defendant told Jones at Everett Bobbitt's house, that he would have Smith off if he had to kill him and drag him off with old Philip, his horse. Dan Wagner testified that about the first of March defendant rode on a horse up to the fence in a pasture at Smith's house and sat there for a time with a shot-gun on his lap. He asked Mrs. Smith where her husband was and she told him that Mr. Smith was out about his business. He appeared to be under the influence of liquor at the time. On the 3rd of March, Kivett testified, defendant again visited him and said, "If you will come, I will give you twenty dollars, just like I tell you, and if the house burns and I get my insurance I will do better than that. I am going to look for you next week." Kivett told him he would telephone before he started. About that time Everett Bobbitt telephoned to George Black, the proprietor of a livery stable at Franklin Junction, to tell Kivett before he went to work that night that the trade was all right, and Black delivered this message to Kivett. On the 8th of March, at Boonsboro, Kivett testified, defend-

ant said, "Rolla, I am going to send for you, and if you do not come, I am going to prosecute you for forgery," referring to the fact that Kivett had been accused of forgery. A few days thereafter, the defendant ate dinner at a restaurant in Fayette with Tom Miller and Walter Goodwin. Defendant asked Miller what he thought about the Smith case, referring to his suit for possession of the farm, and read Smith's contract to Miller, whereupon Miller expressed the opinion that defendant would have trouble getting Smith out. At this the defendant became enraged and applied vile epithets to Smith and said: "I will get him out if I have to haul him out with a team of mules." On the 18th of March, Robert Goodwin, the son-in-law of the defendant, went to the home of Kivett at Franklin Junction and said, "Mr. Bobbitt sent me down after you to help burn that house to-night." Kivett asked, "What boys?" and Goodwin said, "Joe Stewart, Everett Bobbitt and Noble Peacher are going with you. Rolla, I feel like it is worth $50 for you to do this, and you can go with those boys, and if you will, I will guarantee you will get that much." He also said: "Rolla, if you boys burn that house to-night the old man will try to live in the barn, and if he does, we will go there and burn the barn." In order to obtain Kivett's wife's consent to his leaving home that night, Goodwin pretended that he needed Kivett's assistance in a real estate deal, and he said to her, "If you will let him go with me and make the deal, I will guarantee him to get more than a month's wages out of it." Kivett went with Goodwin and they arrived at Goodwin's house at 7:45 that evening. Kivett had a wife and children and worked at the railroad round-house knocking fire out of engines at night. Soon after they reached Goodwin's home, where they found Goodwin's wife and two little boys, Noble Peacher, Joe Stewart, Everett Bobbitt and de-

fendant arrived there. Peacher, a boy about sixteen years old, had for nine years lived with the defendant. Joe Stewart was a young man twenty-three years old, working for the defendant's son Everett. Peacher testified that a week or ten days prior to that time he had heard Goodwin and Stewart talk about burning Smith's house.

According to the testimony of Kivett and Peacher, Everett Bobbitt, Stewart, Goodwin and Kivett played cards until about eleven o'clock that night, when together with Peacher and the defendant they went out on the porch and made arrangements for the burning of Franklin Smith's house. Defendant and Goodwin at the time helped to get things together, participated in the conversation, and said they wanted the boys to burn Smith's house. Defendant appeared to have been drinking some, but was not drunk. Kivett went to the barn and got a bottle of whiskey and the others procured, at the house, a half-gallon of oil, two grain sacks and an old rusty tin bucket. Peacher, Stewart, Everett Bobbitt and Kivett started away from the house towards Smith's place. Goodwin, in defendant's presence, told Everett Bobbitt to give Kivett one of his pistols. The four then went on towards Smith's place. In passing through the pasture they stopped, and Everett gave Kivett one of his pistols, which was a 38 hammerless blue-steel pistol. They drank the whiskey and threw the bottle down. Everett Bobbitt cut a pole and they then crossed the creek and into a field near a corner of the garden south of Smith's house. There Kivett tied some engine waste, which he had brought with him from Franklin Junction, to a pole and poured oil on the waste. Everett and Stewart saturated a sack with coal-oil. Noble Peacher was sent around towards the barn to attract the attention of the dog. The other three went to the yard and up on the little porch at the south end of Smith's

house. Kivett and Stewart with the pole raised the sack with the oil and placed it upon the roof of the house, then Kivett struck a match to the waste on the end of the pole and therewith communicated the fire to the roof. They then started away. Smith's family had retired for the night but a short time before this. During that evening Constable Sartin had come to Smith's house to serve some papers on him in connection with a lawsuit, and the family sat up and talked until near midnight. The light from the oil flame was seen by Mrs. Smith, who gave the alarm that the house was on fire. Mr. Smith jumped out of bed, went into the kitchen, came back and got his revolver and passed out onto the porch on the west side of the kitchen; there he passed his wife, who had preceded him, spoke some words to her, and as he did so, a shot was fired and he fell to the ground a short distance west of the porch, exclaiming, "They have shot me." As he raised up, a second shot was fired and he fell back again. Mrs. Smith saw the flash of the second shot as it was fired, and by the light thereof distinguished the form of a man from his waist down. The fire from the roof lighted up the yard, but no other person was seen. Smith's son by means of a ladder got upon the roof and knocked off the fire sack and extinguished the fire with a bucket of water. This sack, he examined the next day, proved to be a wheat sack, on which was the letter B. Smith was taken into the house, where he died about five minutes later. The pistol ball had struck him in the breast and penetrated the heart. Tracks were discovered about the premises the next day, but led to no definite suspicion. According to Kivett, it was Stewart who fired the shots. This party then ran away across the creek and up on a ridge where they separated, Stewart and Everett Bobbitt going to Everett Bobbitt's house, and Kivett and Peacher to Goodwin's. The latter pair

threw away the bucket as they crossed the stream and passing into the pasture they poured out the unused coal-oil. Kivett and Peacher slept the remainder of the night at Goodwin's house in the same room with the defendant. When they entered the room where defendant was that night, he said, "Well boys, what did you do?" Kivett replied, "Mr. Bobbitt, somebody shot the old man," to which defendant responded, "I hope the old son of a b— dies." Kivett and Peacher were arrested for this crime two or three days later and confessed to the prosecuting attorney.

On the part of the defendant, defendant testified in his own behalf, that he was fifty-eight years old, and had lived in Howard county all his life, except the two years he was in the army. He says that some time before Smith was killed, he went to Franklin Junction to learn the truth of the rumor that Smith had rented another place. While there he had a conversation with Rolla Kivett about Smith moving from defendant's place. Kivett said he would scare Smith out for ten dollars, and defendant simply replied that it had cost him more than that already. He testified further that he never had any other conversation with Rolla Kivett at any time or place in regard to Smith moving from the place or in regard to burning Smith's house, or scaring him or killing him. He denied that he ever offered to hire Kivett or made any arrangements with Bobbitt, Joe Stewart, or any one else to burn Smith's house, or scare him or do him any harm. Defendant's wife and defendant's daughter-in-law, the wife of Everett Bobbitt, testified that Everett Bobbitt and Joe Stewart arrived at Everett Bobbitt's home at 11:15 o'clock on the night of March 18th, and remained there until the next morning. Everett Bobbitt and Joe Stewart both testified for the defendant and denied that there was any conference on the porch at Bob Goodwin's on

the night of March 18th, and denied that anything was said in regard to going to Frank Smith's place; they said there was no talk about Frank Smith in any respect that evening; that they left Goodwin's together at ten o'clock that evening and went direct to Everett Bobbitt's home, where they stayed the rest of the night. They said they were not at Smith's place at any time that night and denied any knowledge of or complicity in any plan for burning Smith's house or doing him any harm. They testified further that the defendant was at Goodwin's home that night and was drunk and asleep in another room during the whole time; that they played cards there that night until they left at ten o'clock; they denied seeing a pistol or hearing one mentioned at Goodwin's that night.

Everett Bobbitt testified that he had been under the charge of murder on acount of this offense, but the case had been dismissed as to him, but the charge of arson was still pending against him. He denied telling Rolla Kivett that his father would give money for the burning of Smith's house, and that he would divide it, and denied any arrangement to telephone Kivett about it. He also denied that he talked with George Black over the telephone as testified by Black.

Stewart testified that he had been tried on the charge of being the man who killed Smith and set fire to his house and had been acquitted by the jury.

Mrs. Robert Goodwin testified that she was the daughter of the defendant and the sister of Everett Bobbitt; that her father was drunk at her home the night of the 18th of March; that he lay on the floor in the front room, and had no conversation with anyone about Smith, and was not out on the porch at all. That her brother Everett and Stewart left the house about ten o'clock. She did not know whether Noble Peacher and Rolla Kivett left the house at all

that night, but that they slept in the room with her father. She went to bed about ten o'clock or ten-thirty, up to which time there had been no conversation among the parties about Smith.

George Tanner and his wife testified that some weeks before the trial during the street fair at Boonville, they talked with Peacher at the Reform School, and Peacher said that he would be glad when the trial of the Smith murder case was over as he would get out of the Reform School then. He further stated that there was nobody at Franklin Smith's house the night of the killing except himself and Rolla Kivett. Peacher denied making this statement. It was shown that Tanner was related by marriage to Robt. Goodwin.

The testimony of the defendant's witnesses further established that the old tin bucket containing a little oil and a piece of waste was found near the place where the tracks cross the creek; that the pole that had been used in setting fire to the house was fitted to a sapling stump, from which it had been cut in the pasture, and near this stump was found an empty whiskey bottle. Four witnesses testified that the reputation of the defendant in the community in which he lived for truth and veracity was good. The defense also put in evidence the record of the circuit court of Howard county, which showed that on the 21st of March, 1907, an information was filed in the said court whereby Rolla Kivett was charged with forging, on the 1st day of December, 1905, a certain bond purporting to have been given by Kivett and others to secure to Howard county the payment of a certain note for $4,000, and it appeared in evidence that Kivett was being detained in jail on account of said charge. It was also shown by the records of said court and by witnesses that Noble Peacher was serving a three years' sentence in the Reform School at

Boonville on the charge of arson for burning Smith's house.

The instructions of the court and the other propositions involved in this appeal will sufficiently appear in connection with the discussion of the various exceptions and assignments of error.

I. Preliminary to any investigation of the various assignments of error by the defendant, the contention of the State that Judge Davis was without jurisdiction to allow and sign the bill of exceptions of the defendant in this case, must be answered, for, of course, if there is no lawful bill of exceptions in the case, there is nothing for this court to do but affirm the judgment. The case was tried at the adjourned August term, 1907, of the circuit court of Howard county, before Judge Samuel Davis, the regular judge of the Fifteenth Judicial Circuit, who because of the sickness of Judge Waller, the regular judge of the Howard Circuit Court, had been requested by Judge Waller to hold the latter part of the said August term. The record recites that Judge Davis was requested "to hold the remainder of the October adjourned term of the August term, 1907, of the circuit court of Howard county, and to take charge of and hold said court on and after Monday, October 21, 1907, and until said court shall adjourn to court in course." As already said, the defendant was tried at the said term before Judge Davis and convicted and his motion for new trial was overruled and he was granted an appeal with leave to file his bill of exceptions on or before the first day of February, 1908, a date beyond the beginning of the next November term of the said court. In vacation, on January 17, 1908, Judge Davis extended the time for filing the bill of exceptions to April 7, 1908. On April 1, 1908, Judge Davis signed the bill of exceptions and on April

2, 1908, the same was filed with the clerk of the said court in vacation.

The proposition of the Attorney-General now is that according to the terms of Judge Davis's call, the period during which he was authorized to act as judge of said court ended with the August term, and he was without jurisdiction at the time he extended the time for filing the bill of exceptions, and at the time he signed the bill of exceptions. In support of his insistence the learned Attorney-General cites us to the case of Viertel v. Viertel, 212 Mo. 562, in which this court in Division No. One had under consideration the jurisdiction of a regular judge of a court to try a cause which had been reversed and remanded after the trial before the judge of another circuit, who had been called in on account of the illness of the regular judge. It appears from the statement of the facts in that case that, owing to the illness of Judge Martin, he was unable to hold the January term, 1906, of the Cooper court, and had requested Judge Davis to hold said term for him, and that Judge Davis held said term and tried the said cause and other cases. Afterwards when the judgment had been reversed by the Court of Appeals and sent back, at a subsequent term, Judge Martin proceeded to dispose of the case, and the objection was made that he had no jurisdiction because Judge Davis had been called in to try the case at the January term, 1906, and this court held that Judge Martin had full power to hold the term and try that cause and that Judge Davis's jurisdiction ended with the end of the term over which he was called to preside. We think there can be absolutely no question about the soundness of that decision, but that is not the point here. Here the question is, had Judge Davis power to allow and sign a bill of exceptions in a case in which he presided as a part of a term for Judge Waller after the lapse of said term?

Certain it is that no other judge had authority to allow and sign said bill of exceptions.   By signing this bill of exceptions and extending the time therefor after the term at which the case was tried, Judge Davis did not exceed his jurisdiction. .  By virtue of the statute, section 2597, he became for all purposes the judge of that court and had all the powers and could perform all the duties of a circuit judge at a regular term of said court, and as an incident thereto he had power to extend the time for filing the bill of exceptions and when allowed and signed by him it became a part of the record.   This has been the universal practice in these cases, and we think it is founded upon reason and common justice.   A contrary ruling would, in a large number of cases, deprive defendants of their right of appeal.   We are satisfied that the Legislature intended no such result and our conclusion is that the objection to the jurisdiction of Judge Davis is not tenable.

II.   It is earnestly urged by the counsel for the defendant that the State having elected to prosecute for murder in the second degree and then having proceeded on the theory of murder committed in the perpetration or the attempt to perpetrate arson, the defendant could not be found guilty of murder in the second degree under the law and the evidence.

That it is competent for the State to elect to indict a defendant for murder in the second degree in the first instance or having indicted him for murder in the first degree, to waive that degree on the trial and proceed to his prosecution for the crime in the second degree, is settled law in this State.   [State v. Talmage, 107 Mo. 549; State v. Moxley, 115 Mo. 644; State v. Schieller, 130 Mo. 510.]   In the last-cited case, it was said by Judge SHERWOOD, speaking for this court, "As it was competent for the State to strike off from the charge of guilt a higher and more aggra-

vated portion of the crime, and to prosecute for a less degree of criminality, so it was competent also for the court properly to instruct as to such lower degree. The first right necessarily includes the second, and defendant is in no position to complain that the evidence showed that he was guilty of murder in the first degree, and therefore should have been prosecuted for that offense, since the lesser degree was included in the higher degree, and contained all the elements of the latter but that of deliberation." "In an indictment for murder in the first degree under our statute every grade and every degree of criminal homicide, from the highest to the lowest, is embraced; it is, in short, in legal effect an aggregation of separate and distinct counts; so that the virtual action of the prosecuting attorney in the present instance was simply to enter a *nolle* as to separable parts of each of the counts of the indictments, thereby eliminating therefrom the counts charging murder in the first degree. . . . No substantial difference is perceived between entering a partial *nolle* before trial begun and afterwards; indeed the former course is to be commended as a saving of both time and costs." [State v. Moxley, 115 Mo. 1. c. 651; 1 Bishop on Criminal Proc., secs. 1387, 1391; Com. v. Tuck, 20 Pick. 356.] It has also been ruled that under an indictment charging murder in the first degree in the common form, the prosecution may put in evidence killing by poison or by lying in wait, or killing with the intent to commit arson, etc., as well as a willful, deliberate and premeditated killing. [State v. Meyers, 99 Mo. 107; 2 Bishop's C. L., 694; Foster's C. L., 258, et seq.; 1 Hale's P. C., 465; Com. v. Flanagan, 7 Watts & S. (Penn.) 415.] By section 1815, Revised Statutes 1899, it is provided, "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing,

and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.'' It has been repeatedly decided by this court that the statute dividing murder into two degrees is a statute of classification and not of definition. And that no homicide can be murder either in the first or second degree, which was not murder at common law. [State v. Shock, 68 Mo. 552; State v. Curtis, 70 Mo. 598; State v. Robinson, 73 Mo. 306; State v. Wagner, 78 Mo. 644.] A homicide committed in the perpetration of arson is not a distinct offense. It is only one of the methods by which murder in the first degree may be committed. It was said in State v. Meyers, 99 Mo. l. c. 113, ''The perpetration or the attempt to perpetrate any of the felonies mentioned in the statute, during which attempt, etc., the homicide is committed, stands in lieu of, and is the legal equivalent of, that premeditation, deliberation, etc., which otherwise are the necessary attributes of murder in the first degree.'' At common law it was not necessary to charge that murder was committed in the perpetration of another crime, but it sufficed to charge it in the common form and then upon proof that the crime was done in the perpetration of robbery, arson or other felony, this answered the ends of the prosecution and stood in the stead of proof of malice aforethought.

The foregoing principles are not seriously disputed by the defendant's counsel, but they assert that when a homicide occurs in the perpetration or in the attempt to perpetrate any arson, robbery, etc., then the occasion of the homicide is made conclusive evidence of premeditation and deliberation; that where the case comes within this class, the question, is the killing willful, deliberate and premeditated? is answer-

ed by the statute itself, and the jury have no option but to find the defendant guilty of murder in the first degree, and as in this case the prosecuting attorney elected to prosecute for murder in the second degree, the defendant could not be found guilty of anything under the evidence in this case. In the consideration of this contention, two sections of our Revised Statutes must be kept in view. Section 2369 provides: "Any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide;" and section 2535 provides: "No indictment or information shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected . . . because the evidence shows or tends to show him to be guilty of a higher degree of the offense than that of which he is convicted." But the defendant insists that in this case, because the evidence tends to show if anything that the homicide was committed in the perpetration of arson and that the statute itself makes such a homicide murder in the first degree only, this character of murder is taken out of the general rule, which permits a prosecuting attorney to elect to try for murder in the second degree. In State v. Wagner, 78 Mo. 644, the homicide was committed by poisoning, and the court instructed upon murder in the second degree, and the jury convicted the defendant of murder in the second degree. This court, in the discussion of that case, said: "Under this view of the law the second instruction was erroneous. On the facts stated in this instruction, which the jury by their verdict seemed to have found to be true, the defendant is guilty of murder in the first degree, a homicide by poison, which is murder at common law, being under the statute, as has been stated, murder in the first de-

gree.   But this error of the court will not warrant a
reversal of the   judgment.''   The court citing in
support of its conclusion, section 1654, Revised Stat-
utes 1879, the same as section 2369 of the present re-
vision.   It will thus be seen that in that case, the
court made no distinction between murder committed
by poison and murder committed by any other will-
ful, deliberate and premeditated criminal action, so
far as the right of the jury to find for the lesser degree
was concerned.   Indeed, section 1817 of our statute
provides that:   "Upon the trial of an indictment
for murder in the first degree, the jury must inquire,
and by their verdict ascertain, under the instructions
of the court, whether the defendant be guilty of mur-
der of the first or second degree, and persons convicted
of murder in the first degree shall suffer death; those
convicted of murder in the second degree shall be
punished by imprisonment in the penitentiary not less
than ten years.''   And this section has been declared
by this court to be a constitutional enactment.   [State
v. Hopper, 71 Mo. 425.],   In State v. Phinney, 13
Idaho 307, under an information for murder in the
first degree committed by the administration of poi-
son, the defendant was convicted of manslaughter and
appealed.   The statute of Idaho was in all essential
respects the same as ours in regard to murder in the
first and second degree, and after an exhaustive re-
view of the authorities, notably those of Pennsylvania,
from which our statute as well as that of Idaho was
adopted, it was held that the defendant could not com-
plain that he was not convicted of murder in the first
degree, and that even though the evidence disclosed
that the defendant was guilty of a higher degree than
that found against him, the verdict could not be dis-
turbed for that reason.   In Lane v. Com., 59 Pa. St.
371, it was held that the Pennsylvania act for the pun-
ishment of murder makes no distinction as to the re-

quirements of the jury to find the degree of murder between any of the modes as defined in it. Said the court: "But it is argued that where the facts bring the case within either of the modes of killing declared murder in the first degree, it being the duty of the jury to find a verdict in accordance therewith, a peremptory direction to find that degree is proper and right. To admit this would be to determine that this portion of the verdict is matter of form, and to substitute a court to do that which the law says the jury shall upon their oaths do. They have undoubtedly the power to fix a lower degree to the crime than the statute provides. They have the power, for the act gives it to them, and no court can refuse their verdict if they do so, or set it aside, unless at the instance of the defendant."

In Rhodes v. Com., 12 Wright (Pa.) 396, the theory of the prosecution was that the murder was committed by the prisoner in perpetrating the crime of robbery, for the prosecutor's house was robbed that day. The effort was to identify him with the robbery, and the prosecution claimed a conviction exclusively on that ground, and the judge in his charge to the jury used almost the same language which the learned judge did in Lane v. Com., supra. The language was, "If you find the defendant guilty, your verdict must state, guilty of murder in the first degree, in the manner and form as he stands indicted. If not guilty, your verdict will simply be, not guilty." And it was urged in defense of this instruction that the evidence exhibited a case of robbery by the hands of the prisoner, and therefore it must be murder in the first degree, if anything, but the court reversed the sentence for the giving of that instruction.

In State v. Greer, 11 Wash. 244, the same contention was made by the defendant that is made by the defendant here, to-wit, that murder in the first

degree by the administration of poison, was a distinct statutory offense complete in itself and without any crime less than the principal one included therein. But the court said: "If the definition of this crime stood by itself, and had no connection with murder in the first degree as otherwise defined, there would be force in this contention. But murder in the first degree, however it may be committed, is the crime which is defined in the section which provides that one of the methods by which it may be committed is by seeking the death of a person by the administration of poison. Such being the fact, there is no distinction between the crime of murder in the first degree when so committed and the crime of murder in the first degree when committed by other means. . . . We are, therefore, of the opinion that the crime set out in the statute is a single one and that, by whatever means it may have been committed, it includes the crime of murder in the second degree and manslaughter, as thereafter defined in the statute. The sections defining these crimes, when construed with section 1319 of the Code of Procedure, which provides that 'upon an indictment or information for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto,' authorized the verdict rendered in the case at bar," which was in that case a verdict of murder in the second degree. Owing to the similarity of our statute defining murder, and the statute providing for punishment for a less degree, it would be seen that that case is in entire harmony with the decisions of this court upon our statute. To the same effect is State v. Howard, 33 Wash. 250.

In so far then as the objection to the right of the prosecuting attorney to elect to proceed for murder in the second degree is concerned, and to the power

of the jury to convict of murder in the second degree, we think the great weight of authority in this and other States is against the contention of the defendant.

In State v. West, 202 Mo. l. c. 138, it was said: "It is now objected that the court erred in giving this instruction on murder in the second degree for two reasons, the first being that if the defendant was guilty at all he was guilty of murder in the first degree and it was therefore reversible error to instruct on murder in the second degree. In support of this contention, we are cited by learned counsel for the defendant to State v. Mahly, 68 Mo. 315, in which it was held reversible error to instruct on murder in the second degree when the evidence tended to show that defendant was guilty of murder in the first degree." It is then pointed out that the Mahly case and others were decided before the revision of 1879, in which it was provided for the first time, "Upon indictment for any offense consisting of different degrees, as prescribed by this law, the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty of any degree of such offense inferior to that charged in the indictment, or of any attempt to commit such an offense, or any degree thereof; and any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide." In State v. Todd, 194 Mo. l. c. 394, 395, it has been ruled by this court that even if the testimony did not warrant an instruction for murder in the second degree, "the defendant is in no position to complain, for if the court erred in instructing for a lesser degree of murder than that with which the defendant is charged, it was error in defendant's favor, of which he has no cause to complain." [See, also, State v. McMullin, 170 Mo. l. c.

630; State v. Frazier, 137 Mo. l. c. 340; State v. Scott, 172 Mo. 536; Johnson v. State, 44 Tex. Crim. 332; State v. Billings, 140 Mo. 193.]

III. It is also insisted that the defendant's request for an instruction of acquittal should have been given, for the reason that there was no evidence that the deceased was killed in the carrying out of the conspiracy to burn the dwelling-house of Mr. Smith, or of a conspiracy to kill him. With this contention we cannot agree if the testimony of Kivett and Peacher is to be believed, and their credibility was for the jury. We think there was much evidence tending to show the conspiracy to burn Smith's dwelling-house, and that the homicide was committed in the course of the perpetration of that offense and the carrying out of that conspiracy. The testimony is set out in the accompanying statement, and it would serve no good purpose to repeat it in this connection. Notwithstanding the fact that the defendant was not personally on the ground at the time the arson was attempted and the homicide committed, yet if, as this witness testified, he was the instigator of these crimes, he is as much guilty as if he had been personally present and fired the shot which killed the deceased. We deem it unnecessary to cite authorities in support of a proposition so well settled as this.

IV. The instruction numbered B was in the following form: "The court instructs the jury that if you believe from the evidence beyond a reasonable doubt, that the defendant, J. E. Bobbitt, at Howard county, Missouri, entered into a conspiracy, agreement and common design with Rollie D. Kivett, Robert Goodwin, Noble Peacher, Joe Stewart and Everett Bobbitt, or any of them, to set fire to or burn 'the dwelling-house of Franklin Smith, and that thereafter, one of said persons who had entered into such conspiracy and agreement did in prosecution thereof and ac-

cording to. said common design, and while acting in concert with the defendant J. E. Bobbitt, willfully kill said Franklin Smith at Howard county, Missouri, on or about the 19th of March, 1907, by shooting the said Franklin Smith in the breast with a pistol, thereby inflicting upon the said Franklin Smith a mortal wound, of which he, the said Franklin Smith, then and there died, then you should find the defendant J. E. Bobbitt guilty of murder in the second degree, and assess his punishment at imprisonment in the penitentiary for a term of not less than ten years.'' And it is insisted that it is erroneous for the reason that it clearly defines murder in the first degree, but erroneously calls it murder in the second degree. But conceding that the facts upon which this instruction is predicated amounted to murder in the first degree, is the defendant in any condition to complain of it? We think not; as already stated, in State v. Wagner, supra, this identical question arose, and this court said: ''Under this view of the law the second instruction was erroneous. On the facts stated in this instruction, which the jury by their verdict seemed to have found to be true, the defendant is guilty of murder in the first degree, a homicide by poison, which is murder at common law, being under the statute, as has been stated, murder in the first degree. But this error of the court will not warrant a reversal of the judgment.'' Our statute provides in section 2369, ''Any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the  verdict of the jury, although the evidence in the case shows him to be  guilty of a higher degree of homicide.''    So that notwithstanding the court required the  jury to find facts which amounted to murder in the first degree and instructed them that if they so found they could only convict the defendant of murder in the second degree, it is obvious that the de-

fendant has no ground for complaint.    By this instruction he was accorded a great advantage in the trial. The error if any, resulted in benefit and not injury to the defendant, and this was clearly the intention of the Legislature when it enacted section 2369, and the other sections hereinbefore referred to.    It cannot be said of this instruction that it did not embrace the essential elements of murder in the second degree, because murder in the second degree is included in murder in the first degree, and as the less is included in the greater, the doctrine announced in State v. Edwards, 203 Mo. 543, cannot avail the defendant in this case.    We have already disposed of the other objection to this instruction, to-wit, that the prosecuting attorney could not elect to try the defendant for murder in the second degree and that the jury could not convict him thereof..    Nor can we assent to the contention that there is no lower degree than that of murder in the first degree in murder committed in the perpetration of arson.

V.    As to the complaint that the court defined the words "wilfully, feloniously, premeditatedly and malice aforethought" we are of the opinion that this action of the court in no manner operated to the injury of the defendant, as the jury were not required to find deliberation or premeditation or malice aforethought.

VI.    Instruction numbered D is also assailed.    It was in this form:    "The court instructs the jury that the testimony of an accomplice in crime, that is, a person who actually commits or participates in crime, is admissible in evidence, but such evidence, unless corroborated by some other witness or witnesses not implicated in the crime as to the facts material to the issues, that is, facts connecting the defendant with the commission of the crime, as charged against him, should be received and considered by you with great

caution.   But if you are fully satisfied that the testimony of an accomplice is true, and that the facts and circumstances testified to by him are sufficient to establish the guilt of the defendant, of the crime as charged under the instructions of the court, then you are at liberty to find the defendant guilty upon such testimony alone.''   The point is made that this instruction does not explain the meaning of the word "corroborate," and various cases in this court are cited on this question.   This instruction, however, is exactly like the one given in State v. Harkins, 100 Mo. l. c. 672, which met the approval of this court.   An instruction similar in all material respects was approved by this court in State v. Donnelly, 130 Mo. 642, and an instruction exactly like it was approved in State v. Dawson, 124 Mo. 422; State v. Crab, 121 Mo. 554; see, also, State v. Jackson, 106 Mo. 179, and State v. Woolard, 111 Mo. 248.   The case of State v. Hunter, 181 Mo. 316, had reference, when rightly understood, to the proof necessary to convict in cases of perjury.

VII.   The refusal of instruction number 8 requested by the defendant is assigned as error.   That instruction was that "if the jury believe from the evidence that any of the witnesses for the prosecution were induced or influenced to become witnesses and testify in this case by any promise or intimation of immunity from punishment, or by any hope held out to them by anyone that it would be better for them or go easier with them in case of their testifying in the case, then the jury should take such facts into consideration in determining the weight which ought to be given to such testimony thus obtained, and given under the influence of such promise or hope.   Such testimony should only be received by the jury with great caution and scrutinized with great care.''   There was no error in refusing this instruction, if for no other reason than that the court in instruction B2 had fully

instructed the jury on the weight of the evidence and
the credibility of the witnesses, and that instruction
went as far as the court was authorized to go without
trenching upon the right of the jury to weigh the testi-
mony. ˙This instruction as prayed by the defendant
was a comment upon the testimony, and there was no
error in refusing it.

VIII.    Defendant also complained   because the
court refused to give an instruction on circumstantial
evidence.    There was no error in refusing this instruc-
tion, for the reason that the State did not seek to con-
vict the defendant upon circumstantial evidence alone,
nor upon evidence principally circumstantial.     The
killing was shown by direct and positive testimony, and
so were the facts connecting the defendant with the
conspiracy.    It is only when conviction is sought on
circumstantial evidence alone that such an instruction
becomes necessary.   [State v. Donnelly, 130 .Mo. 642;
State v. Fairlamb, 121 Mo. 137.]

Instruction number 10 prayed by the defendant
had been fully covered by instruction B given by the
court of its own motion, and by instruction number 6
given for the defendant, and when this is done, it is not
error to refuse an instruction even though it may state
correct propositions of law in the abstract.   [State v.
Barrington, 198 Mo. 23.]

Instruction number 12, asked by the defendant, to
the effect that the absence of any probable motive
for the commission of the crime is a circumstance
which must be considered in favor of the defendant, is
highly objectionable in form because it assumes that
there was an absence of any probable motive for the
commission of the crime, but we do not think the court
was called upon to give an instruction upon motive,
even in a proper form, because it has often been said
by this court, ''A man is not to be acquitted of crime
simply because his motive for perpetrating it cannot

be discovered.'' Moreover, if the testimony of the State was to be believed, there was evidence of a motive ·in the threats made by the defendant against the deceased showing that the defendant was actuated by a feeling of ill-will and revenge. So that a proper instruction on both sides of this question of motive would have been of little or no benefit to the defendant. In Wharton on Homicide (3 Ed.), page 915, it is said: ''When there is evidence of motive, an instruction as to the effect of the absence of a motive is improper and should be refused.''

IX. Finally it is insisted that the court erred in permitting jurors to qualify on the panel, who had prejudged the case and formed an opinion as to the guilt or innocence of the defendant by reading the confession of Noble Peacher. In his motion for new trial the defendant does not specify the jurors who were not qualified, but in his argument in this court he names the jurors Yancey, Green, Wayland and Terrill. The defendant, of course, was entitled to a full and competent panel of thirty jurors before making his peremptory challenges. But in the selection of this panel of thirty, the various jurors were examined upon their *voir dire,* and the defendant given an opportunity to test their impartiality, and it is a settled rule in this State that he should challenge the jurors for cause and state the ground of his challenge. [State v. Taylor, 134 Mo. l. c. 142, 143, and cases there cited.] In Taylor's case, it was ruled that a challenge to a juror in the words, ''Counsel object to this juror as disqualified and challenge him for cause,'' was not sufficient. In Kansas City v. Smart, 128 Mo. l. c. 290, it was said, ''The grounds of challenge to a juror must be stated when he is offered and tested on his *voir dire.* The trial court is entitled to know the reason for the challenge. [State v. Brownfield, 83 Mo. 453; Thompson & Merriam on Juries, sec. 253; 1 Thomp-

son on Trials, sec. 98.]'' The rule thus announced
was reaffirmed in State v. Reed, 137 Mo. l. c. 132; State
v. McGinnis, 158 Mo. l. c. 118, and State v. Evans,
161 Mo. l. c. 108. This whole question was reviewed
again in State v. Myers, 198 Mo. l. c. 247, and follow-
ing. In view of these decisions, it must be ruled that
the challenges to Mr. Yancey and Wayland which was
merely, ''We challenge this juror,'' without stating
any cause or specifying any ground of disqualifica-
tion, was entirely too indefinite upon which to
predicate error in this court. As to Mr. Terrill, while
the court overruled the challenge, the record does not
show that in fact he was challenged or any grounds
therefor, unless it be a general challenge to certain
jurors, who had read the newspapers, but in any event
he comes within the same rule as the objection to the
jurors Yancey and Wayland. Now as to the juror
Green, the challenge was for the reason that he stated
that he had an opinion. Mr. Green swore upon his
*voir dire* that he had read a statement of the crime
in the county newspapers and from reading that he
had at that time an opinion, which he still retained,
but it was not one which could not be changed. He knew
nothing else about the case, and had formed his opin-
ion entirely from this newspaper report. It seems
to be conceded by both sides that a part of this news-
paper report was an alleged confession of Noble
Peacher, who was afterwards a witness in the case.
Notwithstanding this opinion of the juror he, in an-
swer to the court, stated that he had no prejudice in
the matter and could give a fair and impartial trial
as between the State and the defendant, and thereupon
the court overruled the objection.

Section 2616, Revised Statutes 1899, provides:
''It shall be a good cause of challenge to a juror that
he has formed or delivered an opinion on the issue,
or any material fact to be tried, but if it appear that

such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn." It is a well-settled law of this State that a person otherwise qualified to sit as a juror in a criminal case is not disqualified by reason of having formed an opinion as to the guilt or innocence of the accused from reading partial news-the challenges to Mr. Yancey and Wayland which were he states on his *voir dire* that he can give the defendant a fair and impartial trial. [State v. Reed, 137 Mo. 132; State v. Myers, 198 Mo. 1. c. 250; State v. Forsha, 190 Mo. 1. c. 323.]

In State v. Myers, supra, the proposition here advanced in regard to the alleged confession of Peacher was involved as to the extra-judicial confession of Frank Hottman published in a newspaper and which the paper stated would be used against him on the trial. This confession of Peacher, which was offered in evidence, was published in the Democrat-Leader, but was not sworn to. So that it falls strictly within what was said in State v. Myers, in regard to the unsworn statement of Hottman. It was neither evidence taken before the coroner, nor was it the evidence taken on a preliminary examination, and therefore does not come within the rule announced in State v. Culler, 82 Mo. 623. At most it was but a fragmentary portion of the evidence taken in the case of State v. Peacher, and it was ruled in State v. Taylor, supra, that the forming of an opinion upon a fragmentary newspaper report would not disqualify a juror.

In State v. Church, 199 Mo. 629, and following, this question again came before this court, and in that case, the confession of the defendant himself was shown to have been read by the jurors, but each and every one of them who had formed an opinion from the reading of this published confession, answered that

he could, notwithstanding impressions made upon his mind by the reading of it, hear the evidence and give the defendant a fair and impartial trial. In speaking to the point, Judge BURGESS, speaking for this court, said: "The confession as published in the newspapers was part of those publications and the jurors having read them, including that confession, and formed opinions therefrom with respect to the guilt of the defendant, the case is clearly brought within the provision of section 2616, Revised Statutes 1899, which provides that, 'it shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn.' It has always been held under this statute that a person testifying on his *voir dire* in a criminal cause, that he has read newspaper reports of the case and had formed an opinion which it would require evidence to remove, but that he could try the case fairly, is a competent juror." Citing numerous cases.

It follows that in our opinion the challenge to the juror Green as well as to the other three jurors, even had they been specifically challenged, were properly overruled, and that the jurors were competent. And this point must be ruled against the defendant.

Further minor propositions have been advanced, but they are all included in the various exceptions which we have considered and passed upon in the course of this opinion, and no good purpose would be served by naming them specifically.

Our conclusion is that the defendant has had a fair and impartial trial and the judgment should be and is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.