THE STATE, Respondent, v. NUESLEIN, Appellant.

1. A jury, in the case of an indictment for murder, were instructed as follows : "If you have a reasonable doubt of defendant's guilt, you should acquit; but a doubt, to authorize an acquittal on that ground, ought to be a substantial doubt touching defendant's guilt, and not a mere possibility of his innocence :" *held*, that the instruction was good.
2. To constitute murder in the first degree, it is not necessary that the fatal stroke be given with the specific intent to kill ; it is sufficient if it be given wilfully and maliciously, and with the intent to inflict great bodily harm.
3. Whether a weapon used, a stick or club, is of a character likely to produce death or great bodily harm is a question of fact to be passed upon by the jury.

*Appeal from St. Louis Criminal Court.*

*C. C. Carroll*, for appellant.

*C. G. Mauro*, (circuit attorney,) for respondent.

RYLAND, Judge, delivered the opinion of the court.

Jacob Nueslein was indicted at the September term of the St. Louis Criminal Court, in the year A. D. 1856, for the murder of Ann Mary Nueslein. He was subsequently arraigned and plead not guilty. There was a mis-trial of the case in November—the jury failing to agree in a verdict. He was tried in January, 1857, in the St. Louis Criminal Court,

and was convicted of murder in the first degree. He moved for a new trial, which being overruled, he excepted, and brings the case here by appeal. In this court his counsel relies principally for a reversal of the judgment upon improper instructions given by the court below to the jury, and upon the refusal of the court to give a proper instruction asked by the defendant. The bill of exceptions discloses the following circumstantial evidence in the case :—Mary McDonald, a witness for the State, testified as follows: I live beyond the reservoir. I don't know the street. My house is below the reservoir ; I live about forty yards from defendant's house. His house is this side of mine ; his is nearest the city. Defendant lived there four or five months. I knew Ann Mary Neuslein ; she was the wife of the defendant; she is dead; she died on Friday, July last. I saw her on that day before she died ; I saw her that day between seven and eight o'clock, pulling lettuce seed. She was near the fence ; just saw her there. I saw defendant at that time on the other side of the field plowing with horses ; I never saw her after that until I saw her dead; I saw her dead between ten and eleven o'clock of that day. I was eating my dinner and the defendant came to my house. He said, " come neighbor, come ;" he was outside on the prairie, near my door ; he then turned and ran home, entering one door and coming out of another of his house, and passed down to the cellar. I was just behind him. He took hold of her and raised her up and bid her wake up ; I saw she was dead and ran out again ; I did not remain in the cellar but a minute or so, and came right out and met my husband at the cellar door. He went down ; I went back through the house ; I did not then see wounds on her ; I knew by her looks that she was dead ; I felt her leg, it was cold.. My husband came out in a couple of minutes ; he went over for neighbors ; he was not long away ; I remained watching the defendant ; he (defendant) brought her (his wife) in or through the back door, and laid her down on the kitchen floor ; that was when he saw my husband coming back with the neighbors. He (defendant)

State v. Nueslein.

took a pitcher off of the shelf and ran in the hole or cellar again ; he only laid her on the floor; I did not afterwards go to the house until he was taken to the jail.   My husband and a one handed German arrested him ; I did not hear him (defendant) say any thing at that time.   Ann Mary was, as I said, on the floor of the kitchen ; I saw a large cut behind her right ear ; her eyes were black, and her nose was scratched ; her knees were black and blue ; all seemed black and blue around her shins ; they were scratched like you had hurt them.   I saw blood on the wall over the lounge in the dining room.   The blood was as high about as the head would reach in sitting on the lounge ; not a great deal of blood was on the floor.   Her brother Cooper, who was in Frenchtown, came and took her away in a carriage.   I saw said Ann Mary sometimes in the field working with defendant ; at one time I saw defendant strike her ; he made a few boxes at her with his hand ; he struck at her as fast as he could until she ran into the house.   This was a good while before Ann Mary died.   I saw blood on his shirt as they were taking him to jail ; I saw some one having hold of a piece of stick on which there was some blood.   Patrick Shehan has gone away, also his wife.   When I first saw Ann Mary on the day she died, she was in a lump doubled up ; the clothes looked tattered ; her hair was nasty and dirty looking.   I did not see blood in the cellar ; did'n't go to see it.   On cross-examination, the witness said : I reckon defendant knew what ailed his wife when he came to our house.   There might have been persons at defendant's house between the time I saw her in the garden and the time when defendant came over to our house saying, " come, neighbor, come ;" I mean other persons than defendant.   He (defendant) seemed to be much distressed when he came over, judging from his manner ; he seemed like a crazy man. When I first went into the cellar, he shook her up, and told her to wake.   Ann Mary was barefooted at that time.   I saw scratches on her nose ; her eyes were black and her face was black ; I don't know but these bruises might have been caus-

by her falling down; I was but little acquainted with deceased, Ann Mary; I think she was a good little woman; I never saw her drunk.

The coroner, William J. Kennedy, was next called as a witness: He stated as follows: I am the coroner of St. Louis county; I saw defendant first in the calaboose; I went to defendant's house and saw him at the calaboose afterwards; I went there on the 26th day of July last. It was the day after his wife's death. The house is situated near the new city reservoir, to the west of it—about three or four blocks west of it. The house faces to the road running east and west; fronts to the north, being on the south side of the street. Mrs. McDonald lives two or three hundred yards from Neuslein's, being further west. The road runs twenty feet from the house. McDonald's house is rather north-west from defendant's. Defendant's house is a one story frame, with two rooms in it; two doors facing to the north, and one to the south; the rooms alongside of each other; a front door to each of these rooms; a fire-place between the two rooms; the door on the south from the east room; the cellar is underneath the east room; it is about eight feet square, dug out of the clay, and about five feet deep; there was a small hole to go down into it on the south side of the house; the hole is about three feet broad by two and a half deep; it slants down into the cellar, and you have to bend down to get into it; there are no steps going down to the cellar. The said house is within the city and county of St. Louis. I went about eight o'clock in the morning to hold an inquest on Ann Mary Neuslein; I saw her laying on the floor on her back, in a crooked position, in the east room, on the south side of the room, her head towards the west. The house was in a disorderly state. The bed clothing and floor in the west room clean. The bed was in the west room, and lounge in the east room, in the south-east corner. There was blood on the floor under her head; a considerable pool of blood. Her hair was all matted up. There was a spot of blood under the dining table; this was in the north-east corner, about four

feet from where she was laying. There was some blood on the wall, immediately over the settee or lounge, about as high up as a person would sit. There was not a great deal of blood, but enough to see it. I examined the body of the deceased; found a wound on the right side of the head, just above her ear, about one inch and a half in length, cut into the skull bone. The skull bone was laid open, and to be seen. There was a dent, and a sensible one, in the skull. There were bruises on her face. Her eyes were black. In the forehead was a bruise that appeared to have been done with some heavy instrument or fist. Her face was rather pale. There were several other scratches on her face, and one on her nose. There were two bruises on her left breast, one of which was three or four inches in diameter, nearly round; the other was not so large. These wounds were inflicted, as it appeared to me, with some blunt instrument. There were no other wounds on her breast. Both of her shin bones and knees were skinned. The said wounds could be done by falling down or a kick from the boot, both of them. Her legs were skinned from the toes up to the knees. The whole body appeared to be black and blue all over. I did not turn her over. There was blood on the bosom of her clothes and sleeves. She had been bleeding. The blood came out of her right ear, and out of her nose. The right ear was full of blood; the left ear did not bleed any. The nose was swollen. I went down in the cellar; there I saw blood, but not a great deal. It was on the hoops of the barrels, about four inches above the ground; two or three barrels in the cellar, in the back part, to the north-east corner. There were jars and crocks, about a dozen, in the cellar. The barrels and jars took up half the cellar. I saw a piece of pine wood with blood on it, about three feet in length, and about two and a half inches broad, and one inch thick. The stick was broken in three pieces; one piece was about eighteen inches in length, which had the blood on it. It was broken, and there was blood on the new part. The blood was on the new part, as if seized hold of with bloody fingers. There was no

more blood on that piece. I matched those pieces together and they made a stick about three feet in length. There was blood on the smaller piece. I matched the piece to the wound on the head of the deceased, behind the right ear. The blood on the edge of the stick just fit the wound. There was hair on the stick, and that was the same as the hair on the woman's head. A good lick with the stick would knock a person down. She was rather a small woman; looked to be delicate. She might have died from congestion of the brain from the blow inflicted on the head. I have been coroner from last August two years ago. I have held many an inquest in that time. I have seen blows on the head which caused death similar to the wounds on the head of deceased. The wounds on the head and those on the left breast of deceased were sufficient to produce death. I was there about two hours and was holding the inquest. I next saw defendant about twelve o'clock that day; I conversed with him; I asked him if his name was Neuslein; he said "yes." I asked him if he was going to bury his wife, or let the county bury her. I told him he had killed her, and asked him what he whipped her with. He said with a stick of wood. I asked him what he whipped her for. He said she would not cook his breakfast. When I told him he had killed her, he appeared affected and cried. [Cross-examined.] He (Nueslein) did not say that she, the deceased, got drunk. I do not recollect to have stated any thing to the contrary of what I stated now; if I did, it was a mistake. I did not find any blood on the mantel-piece; I do not think the wounds on the deceased could have been produced by a fall. There was no doctor present at the inquest. Her dress was disarranged; I believe I testified her clothes were disarranged. There was most blood on the back of her head. I can not say whether I did state that the most of the blood was in her bosom or not. There was no indication of a struggle. The stick was handed to me, and was in three parts. They were all handed to me. The edges were sharp. The stick was undressed plank. The wound was a contusion rather than a cut. The

State v. Nueslein.

blood was on the edge of the piece handed to me, and not on the side. The blood was on but one piece of the stick, and in one place. I applied the bloody stick to the wound; it fitted the wound. I saw no fracture. There was no fracture on the eye. The bruises were black and blue. I can not tell how long after the blow is inflicted on the person it will look in the way those bruises looked. The skin looked natural all over the body. The black spots around the eyes, I think, could not have come from the same lick that was on the head. She did not bleed to death. The cut behind the ear was two and a half inches from the ear, in the back of the head. There was no penetration of the brain from this cut. I don't know whether the body had been moved before I got there. I can't tell why the body seemed to be contracted. It might have been caused by the agonies of death. She had a young child at this time. The blood was black, but yet fluid. In cases of death by apoplexy I never saw blood flow from the nose, except in the case by drowning; it is almost always so in that class of cases. I have examined for blood in the case of death by apoplexy produced by drunkenness, and never saw any. A person might fall down cellar and obtain such wounds. The floor of the cellar was yellow clay. There was a little water in some places in the cellar. I saw staves and pieces of wood around the entry of the cellar. All those staves were in their places. There was blood on the hoops of the barrels. The frame of the door was three inch scantling; edges sharp. The bruises were black and blue. The appearance of the corpse was natural. I am not certain but that the woman might have died of apoplexy. The hair on the stick was the same as that on the head; of a dark color. The wounds on the breast I do not think would alone have caused her death. The defendant did not particularly describe to me the kind of stick with which he said he whipped his wife when in the calaboose. I tried to make froth come out of her mouth by pressing her breast. I smelt her mouth and there was no sign of liquor. She could not have fallen down the cellar and put blood on the barrels by the

fall. The blood was on one part of the stick; it must have come there after the stick was broken. I don't think a person falling on a stick could have discolored it in this manner.

Peter McDonald, a witness, said : Mary McDonald, a witness in this case, is my wife. I knew Ann Mary, wife of defendant. I live about one block from defendant's house. I recollect the time she died. I saw her that day before her death. I first saw her early in the morning about four o'clock; she was going across her own tillage field. Defendant was there beginning to plow in the end of the field. She was about a couple of perches from Neuslein. I saw her in and out the whole day; I saw her three or four times from eight o'clock to ten o'clock; I saw her about nearly ten o'clock standing by her own stack of oats, a little distance from the house. She was going round the stack; defendant convenient to her. He was standing a little bit from her. She went towards the house; she just ran out and in. After that time I went over there that day. He came for me about half-past eleven o'clock; he went before me and was half way between our house and his when I followed him. I went down after him in the cellar; I saw deceased in his (defendant's) hands. She was dead. He was throwing vinegar or whisky on her and wiping her with a cloth. He asked me to help him to put life in her. I told him he wanted no help; he had done all the work himself; I meant he had killed her. He asked me if I would not say she was drunk? I told him I would say no such thing; I said I would swear he (defendant) killed her. He said, " Oh! neighbor, no." I staid there about half a minute and left him there. I went outside, and told my wife to stay there while I called my next door neighbor, and was gone about two minutes. John Carnum and another man was there. I came back to the house. Defendant was shaking deceased upon the floor. I can't say how he hauled her out of the cellar. Staid there a good while, and myself and another man took him to the calaboose. I did not hear him speak any thing more. It was about two o'clock or after when I

got down to the city hall; walked all the way down. The folks had a stick when I got back looking at it. Some blood was on the back of the stick, on the end of it. It was broken into pieces. There were two pieces. I saw the coroner fit the pieces together. I saw the wounds on her person. I saw her every day before that. She would be hoeing, &c. She was always attending to things about the garden. I saw them often quarreling. He (defendant) used to strike and whip her. Four or five days before the day she died I saw him whip her. Sometimes I would see him strike her with a bean stick. I saw him strike her three times and then she ran into the house. She would not strike him back. I saw him knock her down with a lump or clod. She staggered and fell against the house. That was Tuesday or Wednesday. Thursday and Friday they plowed, and that day she died. I never saw him strike her with his fist. He struck her on Tuesday; he struck her with clods or something and she fell over against the wall. She went into the house. Wednesday and Thursday it was with the sticks. They never lived peaceably. I never saw her strike him. She was a little woman, industrious and worked hard. [Cross-examined.] This was in St. Louis county. I was always on good terms with defendant. I can not see all that passed on defendant's premises. Tuesday, Wednesday and Thursday, he beat her or struck her. I don't recollect, in giving in my testimony on the former trial of this case, that I then said this whipping took place four weeks before her death.

John Sterling, a witness for the State, testified: I have known defendant six years. I live about half a mile from him. Ann Mary Nueslien was the name of the deceased. I called her Anna. I recollect the day she died. I arrested defendant. I came out from town between twelve and one o'clock. Some neighbors rushed together there. I asked what was the matter. They told me that the tailor had killed his wife. I asked the reason why they did not take him out. I went in and said, "John, what you doing? kill your wife?" He said, "no." He was scared. I told him it was no use

to rub her any longer; that she would never wake up again. I told him he was a prisoner, and he said he would knock skin off my face; I and Hans were not able to do it. We tied him with a clothes line, and brought him down to the calaboose. I saw the stick there. I saw him hit her with a hoe. This took place between nine and ten o'clock. [Cross-examined.] I was about two blocks off when I saw him strike her with a hoe. I don't know whether the blow actually struck her or not. She dodged back as if she was struck at.

Mrs. Jane Monan being sworn, testified on the part of the defendant, as follows: I knew defendant and his wife five years. I lived in their house, corner of Tenth and Biddle. I never saw her with the sign of liquor about her more than two or three times. She seemed quiet. I saw her going to her work, stumbling at it. I don't know what his treatment of her was. I knew Nueslein five years, and lived in the same building with him. Nueslein and wife moved away. I never saw her under the influence of liquor but three times; this was about two or three months before they moved away. The next time was a long time before — about six months between the last time and the time before the last that she was in liquor. I never saw her drink any thing myself. I saw them together often. She did not look like a woman that would drink herself to death.

Ann Maher, for defence, testified that she knew defendant and wife five years. The first time she saw her she was quite drunk. She went there sometimes after vegetables. She saw her fall down on her back, her hands and feet up, and she was struggling about ten minutes before she could get up. She picked up the baby which had fallen from her arms and went to the back of the house.

Charles Farterman stated that he knew the parties about one year; he lived in a house on Tenth street; worked for defendant two or three days. Saw her fourteen days or three weeks before she died; never knew her drunk or be under the influence of liquor.

Henry Fischer knew defendant and his wife five or six years; never saw her drink or drunk. Saw her every day— sometimes two or three times a day. This was several years ago.

Dr. A. Hammer being sworn, stated that such a wound as described on the head of deceased may produce death, but it is not probable without some predisposing cause in the patient or person thus cut. I should not think such a wound would produce death. Of course he could not speak with positiveness; nor is it possible to do so in such case without a post mortem examination.

This was all the testimony on either side. The court gave the following instructions of its own accord: "The defendant is charged with murder in the first degree, by having wilfully, deliberately and premeditatedly killed his wife Ann Mary Nueslein, by inflicting wounds upon her with a club. The word 'wilfully,' as here used, means intentional, not accidental. The word 'deliberately' means a cool state of the blood—that is, not in a heated state of the blood caused by a lawful provocation; and the word 'premeditatedly' means thought of beforehand; any length of time however short. If you believe that defendant, in malice, did wilfully or intentionally strike and beat and kill deceased with a club as described in the indictment, and that he did so without being in a heat of passion caused by a lawful provocation, and that he thought of beating and killing her beforehand any length of time, however short, then defendant is guilty of murder in the first degree, and so you should find. If you believe that defendant, in malice, did wilfully strike and wound deceased as described, by striking her with a club or stick likely to produce death or great bodily harm, and that he did so without the specific intent to kill her but with the intent to inflict upon her great bodily harm, and deceased came to her death by wounds inflicted under such circumstances, then defendant is guilty of murder in the first degree, and so the jury should find. Malice here mentioned means a condition of the mind and heart void of social duty

and fatally bent on mischief, which condition is evidenced by former grudges, antecedent menaces and preconcerted schemes to do the party injured some bodily harm; and if you find defendant struck and wounded deceased, as alleged in the indictment, with a stick or club likely to produce death or great bodily harm, the law presumes he struck and wounded her in malice. Although you may believe that deceased was in the habit of getting drunk, and failed to perform her duty as a wife by neglecting or refusing to cook and prepare the meals of defendant, these facts constitute no legal provocation, and passion to mitigate the alleged homicide can not arise therefrom; and if you find that defendant, from either or both of these reasons, wilfully struck and killed deceased with a club likely to kill or cause great bodily harm, with the specific intent to kill or to render her great bodily harm, and that the wounds thereby inflicted caused her death as hereinafter explained, then defendant is guilty of murder in the first degree, and so you should find. And passion, in law, means a heated state of the blood, caused by a lawful provocation; and no heat of passion, to mitigate offence, can be presumed, unless the provocation producing such passion be established by proof in the cause. If you find that defendant beat and wounded the deceased with a club as described in the indictment, or any other weapon or instrument of a similar character, there is no excusable homicide in the case. If you believe defendant killed deceased by blows inflicted with a club not likely to kill or to give great bodily harm, and that he did so without any design to kill her or give her great bodily harm, and that he did so without malice, then the offence is manslaughter in the fourth degree. But if you find that defendant inflicted the wound alleged on deceased, and killed her with malice, then there is no manslaughter in the case. Although you may be satisfied that deceased was laboring under the effects of disease, or was an habitual drunkard, to such a degree as in all probability would have shortly terminated her life, yet if you believe that defendant inflicted wounds as alleged upon de-

ceased which hastened or accelerated her death, this in the
law is a killing of deceased by defendant; and if you find
such wounds were inflicted by defendant upon deceased, and
that the wounds caused apoplexy or any other disease, and
that deceased died of the disease thereby caused, this in law
is a killing of deceased by defendant, and you should so find.
It is not necessary to a conviction in this cause that defen-
dant's guilt should be proved by an eye-witness thereof. His
guilt may be lawfully proven by circumstantial evidence. If
you find defendant guilty of murder in the first degree, you
will simply state so in your verdict. If you find him guilty
of manslaughter in the fourth degree, you will assess his
punishment by imprisonment in the penitentiary not less than
two nor more than three years, or in jail not less than six
months, or by fine not less than five hundred dollars, or by
both a fine not less than one hundred dollars and imprison-
ment in jail not less than three months. If you have a rea-
sonable doubt of defendant's guilt, you should acquit; but a
doubt, to authorize an acquittal on that ground, ought to be
a substantial doubt touching defendant's guilt, and not a
mere possibility of his innocence."

The defendant excepted to the giving of these instructions,
and asked the following: "The jury are instructed that if
they shall find that defendant inflicted chastisement or blows
upon his deceased wife anterior to the day on which she died,
yet that treatment should have no effect in determining the
question of guilt of the prisoner at the bar, unless they shall
believe that that treatment accelerated or contributed in some
measure to that result;" which the court refused to give, and
the defendant excepted.

In this court the defendant's counsel relies chiefly upon
the following instructions for reversing the judgment of the
Criminal Court: "If you believe that defendant, in malice,
did wilfully strike and wound deceased as described, by
striking her with a club or stick likely to produce death or
great bodily harm, and that he did so without the specific in-
tent to kill her but with the intent to inflict upon her great

bodily harm, and deceased came to her death by wounds inflicted under such circumstances, then defendant is guilty of murder in the first degree, and so you should find." "If you have a reasonable doubt of defendant's guilt, you should acquit; but a doubt, to authorize an acquittal on that ground, ought to be a substantial doubt touching defendant's guilt, and not a mere possibility of his innocence;" and also insists that the court erred in refusing to give the instruction prayed for by defendant.

Let us now examine these instructions. First, I will remark that the instructions must be considered in reference to the evidence offered in the case, and this court will consider the instructions given as an exposition of the law of the case, and ascertain whether the law has been fairly and correctly given to the jury by the whole of the instructions, although some one of them or some part of them may be objectionable. The instruction in relation to doubt is the law, although the word "substantial" is seldom used in connection with it. It means a real doubt of the defendant's guilt; not a mere possibility of his innocence. The common phrase is "reasonable doubt" of the defendant's guilt. If there be such, the jury must acquit. We can not say that the jury were misled by the court informing them that the doubt must be a *substantial* doubt; this did not require any thing more than a reasonable doubt of his guilt. They must doubt of his guilt before they can acquit by reason of such doubt. This doubt must be a real state or condition of the jurors, in which they can not say they feel an abiding conviction to a moral certainty of the truth of the charge. It is not a mere possible doubt. "Such doubt however should be actual and *substantial;* not mere possibility or speculation." (Commonwealth v. Harman, 4 Barr, 270; Pate v. People, 3 Gilman, 644; Wharton's Criminal Law, 327.) It does not imply, as the defendant's counsel supposed it did here, that the jury must not only have a reasonable doubt of the defendant's guilt, but they must have also something more; they must have a belief that he is innocent. The Court only meant to inform

them that the law required the doubt to be a real one, not a possibility. We must then rule this point against the prisoner.

In looking over the evidence in this case, there can be no doubt but that deceased came to her death by unlawful and violent means. She was bruised all over her body. Her legs, from her toes to her knees, were skinned. There were large bruises on her breast. Her eyes were blackened, and there was a cut or wound on her head just above the right ear, an inch and a half in length, cut into the skull bone. The skull bone was laid open and to be seen. There was a dent, and a sensible one, in the skull. The evidence shows this, in all probability, was made with a piece of undressed plank, about three feet long, two and a half inches broad, and one inch thick. The edges were sharp. The stick or piece of wood was broken in two or three parts; on one of these parts was a bloody spot equal in extent to the wound on the head of the deceased. By applying the stick to the wound the bloody part fitted the cut. There was hair on this part of the stick, and the hair was the same as that of the deceased's head. The prisoner confessed that he whipped his wife with a stick of wood; leaving no doubt upon the minds of every one who heard the evidence, that the piece of wood described by the witnesses was the stick used in producing her death. The witness (the coroner) stated that a good blow with this stick would knock a person down. It was such an instrument as might cause death to be inflicted by its use. It was an instrument calculated to produce great bodily harm; injuries of a serious character, fatal to life, might be caused by its use. Under this state of evidence, was the instruction complained of proper? The jury were instructed that if they believed the defendant in malice did wilfully strike and wound the deceased by striking her with a club or stick likely to produce death or great bodily harm, and that it was done without the specific intent to kill her, but with the intent to inflict upon her great bodily harm, and that the deceased came to her death by wounds inflicted un-

der such circumstances, then the defendant is guilty of mur-
der in the first degree.   This is in accordance with the law
as laid down in the case of Jennings v. State, 18 Mo. 441.
It is complained of by the counsel in the case now before us,
that the phrase, "great bodily harm," was not explained to
the jury; that what would constitute great bodily harm was
a matter of the law for the court to ascertain, and that it
was wrong to leave it for the jury.   Such is not our view of
the law.   What kind of a stick or club is calculated to pro-
duce great bodily harm, when used as an instrument, is a
matter of fact capable of proof, and the jury is the proper
and only legitimate tribunal to ascertain facts, and from the
evidence before them they can find out with unerring cer-
tainty whether the instrument used is one with which great
bodily harm can be inflicted.   Homicide, committed in the
attempt to perpetrate any arson, rape, robbery, burglary, or
*other felony*, shall be deemed murder in the first degree.
The wilfully and maliciously inflicting great bodily harm
upon another is a felony under our statute of crimes and
punishments.   Therefore, although the jury may believe that
the prisoner did not in this case strike the deceased with the
stick with the specific intent to kill her at the time, but with
the design maliciously to inflict upon her great bodily harm,
and the deceased came to her death by wounds inflicted un-
der such circumstances, then such killing is murder in the
first degree.

The court properly explained the law in regard to murder
in the instructions given.   It explained the terms "malice,"
"passion," "wilfully," "deliberately" and "premeditatedly."
But the counsel for the prisoner contends that the court left it
to the jury to find out what was lawful provocation, and that
this is error, and Dunn's case, 18 Mo. 419, is referred to.
Let us examine this cause of complaint.   As remarked before,
the instructions must be considered in regard to the facts in
proof.   Here the only circumstances offered or referred to by
the defendant to mitigate his crime, to show provocation on
the part of the deceased, were her refusal to prepare his

meals—to cook his breakfast, as he himself alleged, and her drunkenness. Now, although the court below, in explaining the meaning of the term " deliberately," used the expression " lawful provocation," and also in explaining " malice and passion" used the same expression, " caused by lawful provocation," and did not then tell the jury what was lawful provocation, but left the term unexplained; yet the court afterwards takes up the facts, and the only facts having the slightest bearing on the subject of lawful provocation in the case, and distinctly tells the jury these facts do not in law amount to a lawful provocation. So the jury are not left to fancy, or to imagine, or to grope about in the dark, as to whether there was any lawful provocation in this case or not. It was not so in Dunn's case. There was no instruction there explaining lawful provocation; nor did the court, in that case, take up the facts and say to the jury, these in law are or are not considered as affording a lawful provocation. In Dunn's case too, the court improperly undertook to comment upon the evidence. That case was properly reversed and remanded. It is impossible, in the nature of things, for the court to lay down a rule explaining lawful provocation in every given case. This must depend upon the varied facts and matters introduced in evidence; and when facts are offered in evidence for the purpose of showing a lawful provocation, it is the duty of the court to pronounce whether in law such facts amount to a lawful provocation or not.

In looking over the record of this awful deed, there can not arise a doubt of its being murder most foul and cruel. The poor victim must have suffered much from the inhuman conduct of him who should have stood forth her protector and shield.

The instruction asked for by the defendant was properly refused; that evidence was admitted to show how devoid of all social duty and how bent on mischief the heart must be that could inflict such acts on one standing in so near a relation to the perpetrator. It was not to connect the former cruel deeds with the act producing her death, but to show

that he who could thus act towards his wife might go one step further. It was to show the probability of her death being caused by her own husband. There was no eye-witness. The murder had to be found out. The testimony had a tendency to point out the actor, was proper and competent for that purpose, and the instruction was not at all calculated to assist the jury in forming a proper conclusion, nor could its refusal operate to the defendant's injury.

We have given the whole case a patient and thorough investigation. We find no error in the court below. We have noted the principal points relied upon by the counsel of the prisoner for a reversal of the judgment, and feel it our duty to overrule them. The minor points we have not regarded as necessary to be here noticed. Upon the whole record, we find nothing authorizing us to reverse the judgment below. The law then must take its course. The judgment is affirmed, Judge Scott concurring. It is ordered that the judgment of this court be certified to the Criminal Court, in order that the sentence of that court may be carried into execution.