THE STATE v. ARCH D. GLOVER, Appellant.—50 S. W. (2d) 1049.

Division Two, June 10, 1932.*

---

*NOTE: Opinion filed at October Term, 1931, February 17, 1932; motion for rehearing filed; motion overruled at April Term, June 10, 1932.

*Harry H. Terte, Charles C. Madison* and *Jules E. Kohn* for appellant.

*Stratton Shartel,* Attorney-General, and *Don. Purteet,* Assistant Attorney-General, for respondent.

ELLISON, J.—The defendant was convicted by a jury in the Circuit Court of Jackson County of murder in the first degree and his punishment assessed at life imprisonment in the State penitentiary. His motion for a new trial being overruled, he prosecutes this appeal. The State's theory was and is that the appellant, acting in concert with one or more other persons perpetrated the crime of arson by placing a large quantity of gasoline in a certain drug store at 6844 Prospect Avenue, Kansas City, and setting fire to the store, fixtures and stock of merchandise for the purpose of collecting the insurance on the latter. One John R. Morris was a member of the fire department of Kansas City, and with his company responded to an alarm to put out the fire. While he was in the burning building an explosion took place and Morris was pinned down in the ruins and burned to death. The contention of the State is, therefore, that the appellant caused the death of Morris and committed a homicide in the perpetration of an arson, within the meaning of Section 3982, Revised Statutes 1929, which makes such offense murder in the first degree.

The State's evidence tended to show that the appellant and another person bought a stock of drugs and store fixtures in June, 1929, and set up a drug store at the address mentioned. They took out $7500 in insurance on the merchandise and fixtures. The store was a one-story building with basement, located at the northwest corner of Prospect Avenue and 69th Street. There were no buildings north of it in that block. Across the street south was a dwelling house. There was a street car line on Prospect Avenue and the testimony amply supports the inference that the neighborhood was a well populated metropolitan district. It appears there were several fire department stations at different places not far distant, and a large crowd of people gathered at the fire as hereinafter described.

A few days prior to August 5, 1929, the appellant and a confederate purchased sixty to seventy-five gallons of gasoline in twelve to fifteen five-gallon bottles, which they placed in the basement of the drug store. There was also a fifteen to twenty gallon drum of naphtha in the store out of which small quantities were sold commercially.

The appellant admitted in a written confession which was put in evidence by the State that on Friday night, August 3, he and his confederate went to the drug store with the intention of burning it; but they encountered a policeman on the street out in front and desisted. The next night, Saturday, they planned to perpetrate the arson but found too many people passing, so the crime was again postponed. The next night, Sunday, or, more accurately Monday morn-

ing at·1:30 A. M. they went to the basement of the store and carried out their plan in this way. A small electric stove was placed in a convenient position and over and around it they piled shredded tissue or crepe paper. They then began to break the bottles of gasoline so the contents would flow out over the basement floor; but being in a great hurry they simply pulled the corks out of part of the bottles and tipped them·over on their sides. They then turned on the electric stove and fled.

The fire was discovered by a young man waiting for a street car two blocks away. He was attracted by the crash of falling glass and came to the store, where he found the front plate glass window had been blown out so that some of the glass was scattered clear across the street. He turned in a fire alarm at 2:03 A. M. and firemen responded within a few minutes. The fire was soon extinguished, or nearly so, in the store room, and firemen, including the deceased Morris, were on the inside thereof when another explosion occurred. It was so violent that the south wall of the building was blown out, the roof on that side fell down to and partly into the basement, the ground floor of the store buckled up and sagged back down into the basement, and bricks were scattered clear across the street. The building was reduced to a mass of ruins and flames shot high over the whole area. A bystander was blown eighteen feet out into the street between the street car rails. The deceased Morris was pinned down in the ruins and burned to death. The fatal explosion occurred a little before 2:30 A. M., all within an hour after the fire was kindled. No one lived in the building or was in it when the appellant and his confederate left.

The appellant stood on his demurrer to the State's evidence and offered no testimony in his own behalf. Other facts will be stated as necessary in the course of the opinion.

I. No point is made by appellant on the form of the indictment, and to us it appears to be sufficient. His contention is that even though it be conceded he perpetrated the arson, the further fact is established that he left the premises before the fire began to burn and had no intention of injuring or killing anyone, or any idea that anyone would come to the building and be injured or killed. The position of appellant's counsel in their brief is that in order to convict a defendant of first degree murder under Section 3982, Revised Statutes 1929, because of a homicide occurring in the perpetration of an arson (or any of the felonies enumerated in the statute) early cases in this State required proof that the defendant intended to *inflict bodily harm*, citing: State v. Jennings, 18 Mo. 435; State v. Nueslein, 25 Mo. 111, and State v. Green, 66 Mo. 631.

Next they say these early decisions were overruled by later cases which required proof on the part of the State that in the perpetra-

tion of any of the felonies mentioned it was the intent of the defendant to *kill*, citing: State v. Shock, 68 Mo. 552; State v. Earnest, 70 Mo. 520, and State v. Hopper, 71 Mo. 425.

These cases, they assert, were overruled by the decision in State v. Hopkirk, 84 Mo. 278, which reestablished the rule announced in the early Jennings case, supra, 18 Mo. 435; and they contend the law ever since has been and now is that to convict a defendant of first degree murder for a homicide committed in the perpetration of arson or any of the other felonies enumerated in the statute, it is necessary for the State to show a specific intention on the part of the defendant to *inflict bodily harm*.

█ This contention in our opinion is wholly erroneous. In discussing it it will be necessary to trace the history of the statute and to discuss certain of the foregoing cases. Prior to 1879 it read as follows (italics hereinafter appearing throughout are ours):

"Every *murder* which shall be committed by means of poison, or by lying in wait, or by any other kind of wilful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, *or other felony*, shall be deemed murder in the first degree." [R. S. Mo. 1845, sec. 1, p. 344; R. S. Mo. 1855, sec. 1, p. 558; G. S. Mo. 1865, sec. 1, p. 778; Wag. Stat. (1870), sec. 1, p. 445.]

In State v. Jennings, 18 Mo. 435, the first case cited by appellant, a man had been flogged to death (but not in connection with a robbery or any of the other felonies specified in the statute). An instruction given for the State said though it was not the intention of the defendant and his conspirators to kill the deceased, yet if they did intend to do him great bodily harm, and in so doing death ensued, the killing was murder in the first degree. The court held this instruction correct saying that under the statute a "homicide committed in the attempt to perpetrate any arson (etc.), *or other felony* shall be deemed murder in the first degree." The court then went on to say that another section of the statutes (R. S. 1845, sec. 38, p. 351) "makes the person by whose act or procurement great bodily harm has been received by another, guilty" of a felony. This latter section was the predecessor of what we now commonly call the "felonious assault" statute.

So the reasoning of the court in this Jennings case amounted to this: that although the defendant therein had not been perpetrating or attempting to perpetrate any arson, robbery or other specific felony mentioned in the first degree murder statute, yet since he had been flogging the deceased, and since the flogging was made a felony by the "felonious assault" statute, therefore the act came within the designation "or other felony" in the murder statute. On this ground the instruction was held good. But the case does not say or mean to

say that an intent to do great bodily harm must attend every arson or other specific felony mentioned in the murder statute before a homicide resulting therefrom can be classed as first degree murder. The only reason the intent to do great bodily harm was of importance in the case, was because the court was bringing the flogging within the felonious assault statute as a separate and distinct felony out of which the homicide grew, and thereby converting the homicide into first degree murder under the murder statute.

The doctrine of the Jennings case was followed in State v. Nueslein, 25 Mo. 111, where a man beat his wife, who died though he did not mean to kill her; and in State v. Green, 66 Mo. 631, where a man resisting arrest killed the officer.

But these cases were overruled in State v. Shock, 68 Mo. 552, wherein a man threshed a boy with a piece of fishing rod and a grapevine as a result of which the boy died. The court gave an instruction, as in the Jennings case, that though the defendant did not intend to kill the child by whipping him, yet if he did intend to do him great bodily harm, and death resulted, he was guilty of murder in the first degree.

In condemning this instruction and overruling the Jennings case the decision called attention to the fact that the "constructive murder" part (as we shall call it) of the first degree murder statute provided "every *murder* . . . which shall be committed in the perpetration . . . (of) any arson . . . or other felony shall be deemed murder in the first degree." It was pointed out the statute did not say "homicide" but used the word "murder;" and that the section next following went on to say (as it ever since has and does now, Sec. 3983, R. S. 1929) "all *other* kinds of *murder at common law*, not herein declared to be manslaughter, or justifiable or excusable homicide, shall be deemed murder in the second degree." From this the conclusion was reached that the first degree murder statute embraced only killings which would have been murder at common law; that it was merely a statute of classification, not of definition; and since at common law there could be no murder without an intent to kill, such intent was necessary under the constructive murder statute. That is our understanding of the opinion. The same doctrine was followed and stated more explicitly in State v. Earnest, 70 Mo. 520, and State v. Hopper, 71 Mo. 425.

This Shock case went further. It held (we shall not attempt to detail the course of reasoning) that if, as in the cases thus far mentioned, one person assail another, though without intending to kill him, and the latter person die, the assault and its result are all one offense; that the assailant will be held responsible for the consequences of his act (being *malum in se*) though he did not intend them; that the assault is simply a constituent element of the homicide, merging

therein, and not a separate, independent felony; that the "constructive murder" statute need not be, indeed, could not be, appealed to in such instances; and that the words "or other felony" appearing therein referred to some *collateral* felony, like arson, robbery, etc., and not to acts which themselves constituted the homicide. Norton and Sherwood, JJ., dissented in a vigorous opinion by the former, and the case evidently attracted legislative attention, for after the decision was handed down in 1878, the General Assembly in 1879 amended the statute by striking out the words "or other felony" and substituting the words "or mayhem." [Sec. 1232, R. S. 1879.]

Six years later in 1884, the case of State v. Hopkirk, 84 Mo. 278, 287, was decided, opinion by Sherwood, J. The defendant and another shot and killed W. in perpetrating a robbery. The decision overruled the Shock, Earnest and Hopper cases, last aforesaid. While agreeing with them that the "constructive murder" statute was a statute of classification and not of definition, and that it embraced only such killings as would be murder at common law, it denied that at common law no homicide could be murder unless there was an intent to kill. The contrary was affirmed, that at common law "a homicide committed in the perpetration of a felony was murder, and this, whether there was any precedent intention of doing the homicidal act or not." citing several English authorities and American cases. Two judges concurred *in toto*. Ray, J., concurred in the result, saying in a separate short opinion he agreed if the person robbed be killed in the perpetration of the robbery, the offense would be first degree murder; but that it was unnecessary to decide whether the same would be true if the killing were collateral to the robbery—that is if the person killed were a third person.

Henry, C. J., dissented in an elaborate separate opinion, quoting copiously from Section 184 of the second edition of Wharton on Homicide, where it was declared (as in the Shock case) that when a constructive murder statute uses the word "murder" and not the word "homicide," a killing must amount to common-law murder to come within it. The author went on to say the following, which we quote because of its bearing on the facts of the instant case:

"No doubt if a person sets fire to a dwelling house under such circumstances that its inmates, as an ordinary sequence of the fire, are burned and die, then such malice is to be inferred as will make the case murder at common law. The defendant, we may be bound, as a presumption of fact, to infer, knew the house was a dwelling house, and knew, supposing the fire to be communicated to it, that some one of its inmates would, in the ordinary course of events, be injured by the fire. The case would be that of a reckless and malicious firing into a crowd, which is murder at common law, if death ensued. But suppose that when perpetrating the arson the defendant, in acci-

dentally discharging a gun, killed someone either in the house or in its neighborhood. Now, though we have several high authorities to the effect that this is murder at common law, the sounder view, as we have already seen, is that in such case the defendant should be tried for arson in firing the building, and for manslaughter in the unlawful killing (without malice aforethought) of the deceased; since the malice aforethought necessary to constitute murder cannot be inferred, in face of the fact that the killing was in no way within the scope of the defendant's plan, from the mere fact of the arson.''

But Judge HENRY stood alone in his dissent and the next year the General Assembly, evidently to put the question at rest, by Laws 1885, page 138, inserted the word *homicide* in the statute, making it read as it has ever since (Sec. 3982, R. S. 1929) to-wit:

''Every *murder* which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every *homicide* which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.''

The Hopkirk case has since been followed in Missouri, State v. Sexton, 147 Mo. 89, 101, 48 S. W. 452; State v. Bobbitt, 215 Mo..10, 32, 114 S. W. 511, et seq. And in a more recent decision, State v. Hayes (Mo. Sup.), 262 S. W. 1034, 1037, by WHITE, J., a conspiracy case, it is said:

''If the common design is to commit robbery, rape, arson, or any one of the other felonies mentioned in Section 3230 (now 3982, R. S. 1929), the homicide committed in pursuance of the purpose is murder in the first degree whether the death was intended or not. The commission of, or the attempt to commit, the felony is the legal equivalent of premeditation, deliberation and malice.''

And of course it goes without saying that in such instances the law supplies or presumes also an *intent to kill*. Indeed, there could be no premeditation, deliberation or malice, in the statutory sense, without an intentional killing. As is stated in State v. Wieners, 66 Mo. 13, 22:

''If one in perpetrating or attempting to perpetrate a felony, kill a human being, such killing is murder, although not specifically intended, for the law attaches the intent to commit the other felony to the homicide. The law conclusively presumes the intent to kill.''

█ Aside from the statute, our Missouri decisions are well supported by general authority on the proposition that at common law an unintentional homicide was murder if committed in the perpetration of a felony. [29 C. J. sec. 70, p. 1097; 13 R. C. L. sec. 149, p. 846; 63 L. R. A. p. 354, note; 1 Hawkins, P. C., Ch. 29, sec. 11, p. 112; 1 East, P. C., p. 255; 1 Michie on Homicide, sec. 22 (1), p. 135.] It is even stated that though the felony were not dangerous to life

and the killing accidental, the law made it murder. [2 Bishop on Criminal Law (9 Ed.) sec. 694, (2) p. 527.] This was on the theory that "the common law measures an act which is *malum in se* substantially by the result produced, though not contemplated." [People v. Olsen, 80 Cal. 112, 126.]

But the weight of authority, especially modern authority, does add another qualification. It is said in 29 Corpus Juris, section 70, page 1097, that in order to make an unintended homicide committed in the perpetration of a felony first degree murder, "the homicide must be an ordinary and probable effect of the felony." In the annotation in 63 L. R. A., page 368, a number of cases are reviewed from which the principle may be deduced that the felony and the homicide must not be associated merely in point of time, but they must be integrated and related in a causal way. In 13 Ruling Case Law, section 148, page 845, the law is thus stated:

"It may be stated generally that a homicide is committed in the perpetration of another crime, when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the *res gestae* of the intended crime, and in consequence thereof, the killing results. It must appear that there was such actual legal relation between the killing and the crime committed or attempted, that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it. In the usual terse legal phraseology, death must have been the probable consequence of the unlawful act."

As to what may be considered within the *res gestae* of a crime, the following is quoted with approval from Wharton, in Hunter v. State, 40 N. J. Law, 495, 538:

" 'The *res gestae* may therefore be defined as those circumstances which are the undesigned incidents of a particular litigated act, which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. . . . Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary, in this sense, that they are part of the immediate preparations for, or emanations of such act, and are not produced by the calculated policy of the actors.' "

The foregoing general doctrine can hardly be made more specific. Its application will vary with the facts of the particular case. But it can be asserted with fairness to the accused here that even though the homicide be unintentional, yet if it be committed in course of perpetrating the felony, and is a natural and proximate result thereof, such as the defendant reasonably was bound to antici-

pate—and therefore especially where the felony is dangerous and betokens a reckless disregard of human life—the homicide will be first degree murder under the statute.

Measuring this case by the standard just set. There are not many decisions where a homicide grew out of an arson. In Regina v. Horsey, 3 Foster & Finlason's Rep., p. 287, decided in 1862, the statement contained in the report of the case shows the defendant willfully set fire to a straw stack in an enclosure in which was also an out-house or barn, but not adjoining any dwelling house. While the fire was yet burning the defendant was apprehended on the spot and the deceased was seen and heard to shriek in the flames, and his body was afterwards found in the enclosure. It did not very clearly appear whether he had been in the out-house, or merely lying on or beside the straw stack, but the probabilities seemed that he was a tramp lying asleep somewhere about when the fire was kindled. There was no evidence as to how or when he had come there, nor any evidence that the defendant had any idea that anyone was, or *was likely to be*, *there*. On the contrary, it appeared the defendant was shocked when he discovered someone was in flames, and wanted to go to his rescue.

The judge instructed the jury that when a defendant, in the course of committing a felony, caused the death of a human being, it was murder even though he did not intend it; but that a man is not answerable except for the natural and probable result of his own act; "and therefore if you should not be satisfied that the deceased was in the barn or enclosure at the time the prisoner set fire to the stack, but came in afterwards, then, as his own act intervened between the death and the act of the prisoner, his death could not be the natural result of the prisoner's act." The jury acquitted the defendant.

In Regina v. Serne, 16 Cox's C. C. 311, decided in 1887, the defendant was charged with murdering his young son by willfully setting fire to his house and shop to collect the insurance thereon. The defendant with his wife and four children were living in the home at the time. The building was destroyed and his two sons were burned to death in the fire. The defendant, his wife and two daughters were rescued from the roof of an adjoining house. The defendant was acquitted by the jury, so far as appears from reading the case, merely because they did not believe he started the fire. On this issue of fact the court's instructions seemed rather favorable to the defendant. No important declaration of law was given except that the judge said "I think that, instead of saying that an act done with intent to commit a felony and which causes death amounts to murder, it would be reasonable to say that any act known to be dangerous to life, and likely in itself to cause death done for the purpose of committing a felony which caused death, should be murder." As an

illustration, among others, the court referred to the "Clerkenwell explosion case in 1868" when a man named Barrett was charged with causing the death of several persons by an explosion which was intended to release one or two men from custody. The court said "I am sure that no one can say truly that Barrett was not justly hanged."

In Pliemling v. State, 46 Wis. 516, 521, 1 N. W. 278, decided in 1879, a mother and her three children were found dead in the ruins of their home, which had been burned. The defendant was prosecuted for killing them under a statute providing that murder in the third degree is "the killing of a human being, without a design to effect death, by a person engaged in the commission of any felony." It was the theory of the State that the defendant, while engaged in the felonious perpetration of rape or adultery upon the mother, had unintentionally caused the death of the entire household through the burning of the building. Whether he fired the house intentionally or accidentally is not clearly stated but apparently it was the former. The opinion rules the initial felony—rape or adultery—had no such relation to the subsequent homicide by burning as to make the latter a consequence of the former, and to permit the felonious intent involved in the criminal sexual act to be attached to the killing. This was held to be especially true with respect to the three children who had no connection whatever with the rape.

In Reddick v. Commonwealth, 17 Ky. Law, 1020, 33 S. W. 416, decided in 1895, the defendant was charged with murder in that he set fire to a hotel building late at night thereby causing the death of a person living therein. An instruction for the State told the jury if the defendant "wilfully, maliciously, and feloniously set fire to and burned the Miller Hotel, then being occupied by Mrs. Masters as a residence, and that by reason of that burning she lost her life" he was guilty of murder although he "may not have intended or calculated the death of Mrs. Masters as a result of such burning." The Kentucky Court of Appeals held the instruction good saying the arson clearly was *malum in se*, "the felonious intent and purpose of accused in doing which, if guilty, the law certainly transfers to a consequence and result of same so natural as that the inmates of the house might by such fire lose their lives."

In State v. Bobbitt, 215 Mo. 10, 39, decided in 1908, the defendant was prosecuted under the constructive murder part of our statute. He owned a farm and desired to evict a tenant therefrom. To that end he procured certain parties to set fire to the tenant house thereon about midnight. Very shortly afterwards the first was discovered by the inmates and the tenant came outdoors with his pistol whereupon one of the group shot and killed him. It was held the defendant was guilty of murder as a conspirator, under the statute, since "the homicide was committed in the course of the perpetration of" the arson.

In these five cases we have this situation. The Pliemling case, from Wisconsin, holds a homicide by burning was not constructive murder because it did not have a close enough relation to, and was not a consequence of, the antecedent felony of rape or adultery; whereas in the Bobbitt case, from Missouri, the independent shooting and killing of one who discovered conspirators "in the course of" the perpetration of arson was declared to be constructive murder.

In the Reddick case, from Kentucky, the burning of a hotel building and resultant death of an inmate thereof, was held to be murder. The opinion in effect states that the defendant knew or had good reason to believe there were people in the building when he kindled the fire. The same rule is declared in the long quotation from Wharton on Homicide appearing in State v. Hopkirk, 84 Mo. 1. c. 289, hereinbefore set out. In the Horsey case from England the court held if deceased came to the place of the arson and got into the fire after the defendant had started it, his own act was an intervening cause, and the homicide was not the natural and probable result of the arson. But the burning there was of *a straw stack in an out of the way place*, and the statement of facts recites there was no evidence "that the defendant had any idea that anyone was, *or was likely to be there.*" In the Serne case from England the court said a man who caused the death of several persons by an explosion perpetrated to release certain prisoners from custody, was justly hanged.

The doctrine to be gathered from this last group of cases, as we interpret them, is that if a defendant perpetrate an arson by setting fire to a building in which he knows or has reason to believe there are human beings, and if, in consequence, one of the inmates be burned to death, the defendant will be guilty of first degree murder; but if the burning be only of a thing and at a place where the defendant has no reason to believe anyone will be injured, and the person killed come in later, the defendant cannot be charged with murder, for there the homicide will not be regarded as a natural and probable result of the arson, and the act of the deceased in getting into the fire will be treated as an intervening cause.

In the present case, as in the Horsey case, the deceased fireman was not in the building or at the place of the arson when the fire was set out, but came later. But can that make any difference if the appellant reasonably was bound to anticipate that people naturally and probably would come to the fire and be injured thereby, especially when its explosive nature is considered? In our opinion when a person perpetrates an arson and the life of a human being is destroyed by the fire, it is wholly immaterial whether the deceased was in the building or outside of it at the time the fire started—if, only, the defendant was chargeable with notice that fatal injury likely would result from his felonious act. And so, in the present case if

the appellant had reason to think members of the fire department of Kansas City and citizens generally would congregate at the drug store to fight the fire, and thus would place themselves within perilous range of the flames and potentially destructive forces that had been set at work, the ensuing homicide was a natural and probable consequence of the arson; and the fact that the deceased fireman came after the fire began to burn did not break the causal relation between the arson and the homicide, or constitute an independent intervening cause.

This is particularly true since the act of intervention on the part of the deceased fireman was naturally *invited* by the appellant's act in starting the fire, 13 Ruling Case Law, section 60, page 753. On this question the following civil cases are somewhat in point.

Buchholz v. Standard Oil Co., 211 Mo. App. 397, 405, 244 S. W. 973, 975, was an action for wrongful death. The defendant Oil Company had a shed with an oil soaked floor. An automobile truck was driven therein which spit fire through the muffler and caused the building and premises to burn up. An oil tank exploded and a part·thereof hurtled through the air, killing the plaintiff's intestate who had come as a bystander and spectator. The Kansas City Court of Appeals held the deceased ''was killed as the direct result of the maintenance of a nuisance by the defendant;'' and that the latter was guilty of ''gross negligence'' in storing large quantities of gasoline in close proximity to the thickly populated portion of the town and in tolerating about the premises instrumentalities which would throw off sparks; and further added ''we cannot say as a matter of law that the going of deceased . . . to the scene of the conflagration was the proximate cause of her death.''

In Combs v. Standard Oil Company (K. C. Mo. App.), 296 S. W. 817, the plaintiff sued for personal injuries. The defendant's filling station at Polo, Missouri, caught fire. In a room on the premises was a metal barrel containing about thirty gallons of ''neolite,'' a highly refined kerosene. There was some delay in getting the city fire engine to the scene and the neolite exploded. The plaintiff's leg was cut by a piece of glass falling out of the window of an adjacent building as a result of the explosion. He had gone to the vicinity, he said, ''to see if he could help save anything, or if there was anything he could do.'' He sued on the ground that the ·defendant negligently failed to remove the barrel of explosive fluid out of the way of the fire. It was held he could recover, and in line with the Buchholz case, last above, that his presence at the scene of the fire was not, as a matter of law, the proximate cause of his injury.

In Rathbun v. White, 157 Cal. 248, 254, 107 Pac. 309, a hardware store caught fire, in which certain gun powder was wrongfully stored in violation of a city ordinance. The powder exploded and injured

a fireman who had come with the city fire department in response to an alarm. The cause was reversed for error in the instructions, but it was held the fireman had a good cause of action against the store proprietor. To the same effect are Pinson v. Young (Kan.), 164 Pac. 1102, and Houston Belt & Term. Ry. Co. v. O'Leary (Tex. Civ. App.), 136 S. W. 601. The latter case holds that in such circumstances a fireman is an invitee.

That it was a highly reckless act to leave a large quantity of gasoline where fire would be communicated to it, and one fraught with great danger to persons who might come within its range, goes without saying. The Buchholz case, supra, decides that, and there is another to which attention may be called. In Huckleberry v. Mo. Pac. Rd. Co., 324 Mo. 1025, 1036, 26 S. W. (2d) 980, 984, a freight train was wrecked and the contents of tank cars loaded with gasoline were spilled on the right of way, where the gasoline gathered in ditches and depressions and the atmosphere became impregnated with a gaseous vapor. A spark from an engine caused an explosion and a boy who had come there was killed. It was held the deceased, though outdoors in the open air, was in *imminent peril* under the humanitarian doctrine, by reason of the explosive vapor and the spark emitting engine.

It may be objected the foregoing have no application to a criminal prosecution because they are civil cases. If not, why not? Can it be true that if the widow, minor children or personal representative of the deceased fireman were suing the appellant civilly, under Section 3263, Revised Statutes 1929, for his wrongful death the law would treat the death as a natural and proximate result of the appellant's wrongful act, and would refuse to rule as a matter of law that the coming of the fireman to the scene was the intervening and proximate cause of his death; and yet in the present case, where the appellant is called upon to answer in a criminal prosecution for the same conduct the opposite rule will be applied? It cannot be so. As a matter of logic if a given result be a natural consequence of a given act in a civil case, it cannot be otherwise in a criminal case involving the same facts.

Neither can it be contended there is a difference in that in a civil case the defendant is liable if only he was *reasonably bound to anticipate* some injury might result from his negligent act, whereas in a criminal case for constructive murder he must *actually intend* bodily injury. As already shown, even under the most extreme decisions the felony need only be *dangerous* to human life to make the defendant criminally responsible. The statute uses the term "homicide," which signifies merely the killing of one human being by another, 29 Corpus Juris, section 1, page 1049; and as we have seen, the word was inserted to exclude the idea of intentional killing. It would be

a novel rule, indeed, that would attempt to draw a distinction between intending *injury* and intending *death* as a result of the uncontrolled forces of a fire or explosion, or any felonious act *likely* to inflict great bodily harm—that is to say, if, as is well settled, the killing need not be intentional, by the same token bodily harm need not be intended. The law supplies the intent. To say in such a case that a defendant may exculpate himself merely by proving he had no actual intention of inflicting personal injury, would be like allowing him to invoke the doctrine of self-defense because *he* believed his adversary was about to do him great bodily harm; whereas the law is and always has been that such apprehension must be reasonable. [Sec. 3985, R. S. 1929; State v. Roberts, 294 Mo. 284, 301, 242 S. W. 669; 30 C. J. sec. 232, p. 61; Kelley's Criminal Law (3 Ed.) sec. 519, p. 458.]

Without further prolonging this discussion, what do the facts of the instant case show? To begin with, the evidence establishes without controversy that the death of the fireman was the direct consequence of the intended arson. Because of the explosion, he was pinned down in the ruins and burned to death. There was no independent homicidal act such as the shooting in the Bobbitt case; and no separate accidental act. Furthermore the case is stronger than any of the civil suits mentioned, because all that happened in them was that the defendant was guilty of some *negligence* in placing, keeping or leaving explosives where they might be set off. In this case the appellant not only did that, but he deliberately set fire to them, and then went away leaving the death trap without any warning to those who might come. It was a wanton act betokening a disregard for human life—if the appellant was reasonably bound to anticipate that human beings might come there and be injured or killed.

That this is so, we think is established not only by the authorities cited above, but by the facts of this particular case. The neighborhood was an inhabited, well populated metropolitan district, not an isolated farm house, as in the Horsey case. The thing destroyed was not a straw stack, but a business building stocked with merchandise. There were several fire stations scattered about in that district. Is there not good ground for an inference that the appellant reasonably should have anticipated these fire departments would be summoned, and that people would come, just as they did do?

Not only is that true, but the appellant's own confession indicates he did in fact realize people would be attracked by the fire. He and his confederate first planned the arson for Friday night, but desisted because they saw policemen around. Again, Saturday night they postponed it because "too many people were passing." Finally when they perpetrated the arson on August 5, it was 1:30 A. M. Obviously they wanted the drug stock to be completely and rapidly consumed

and to thwart outside interference, so far as possible, so all evidence of their criminality would be destroyed, and all insurance could be collected. In our opinion, the facts made a case for the jury.

II. The appellant makes the further point that even though it be held he did not commit the homicide, in the sense that he is legally responsible therefor as a natural and proximate result of his act in setting out the fire, yet the facts do not bring the case within the statute because the homicide was not committed ''in the perpetration'' of the arson. Appellant's idea is that when he communicated fire to the building and left the premises the crime of arson was complete, and the death of the fireman occurred afterwards. To this we do not agree. The same contention was made and rejected in State v. Messino, 325 Mo. 743, 764, 30 S. W. (2d) 750, 759, where the defendant and his conspirators robbed a bank and shot a· policeman while fleeing with the loot. It was held that while the act of asportation was sufficiently complete, even before the policeman was encountered, to have supported a prosecution for robbery, yet the crime was nevertheless in course of perpetration throughout the flight of the conspirators until they had reduced the property taken to their own unmolested dominion.

In the present case the arson was committed to defraud insurers of the drug stock and fixtures (Sec. 4040, R. S. 1929). That involved the *destruction* of the property, and it can hardly be asserted the appellant could absolve himself from the consequences of his act merely by withdrawing from the scene after he had put fatally destructive forces in motion to accomplish his purpose. The exact question is discussed and so decided *arguendo* in Bissot v. State, 53 Ind. 408, 413, in a long passage which is quoted with approval in Conrad v. State, 75 Ohio St. 52, 68, 78 N. E. 957, 6 L. R. A. (N. S.) 1154, 8 Ann. Cas. 966. This point is ruled against appellant.

III. Error is assigned on the ground that the State's instructions No. 5 and 6 authorized a verdict of first degree murder against the appellant without requiring the jury to find the homicide was the natural and probable consequence of the arson.

Instruction 5 told the jury they should convict if (in substance) they found the appellant set fire to the drug store building and contents to defraud insurers of the contents, and that while in the perpetration of that arson the fireman John R. Morris sustained burns, wounds and bruises *''as a result of''* the burning of the building and contents, from which he died the same day.

Instruction 6 declared it was not necessary for the jury to find the appellant at the time he set fire to and burned the building (if so) intended to kill the fireman, Morris; but that before they could convict they must further find the appellant did willfully and feloniously

set fire to the building and contents for the purpose of defrauding the insurers; and that in the perpetration of the arson by the appellant the fireman, Morris, sustained wounds and burns *"as a result thereof,"* from which he died on the same day. (Italics in both the foregoing paragraphs ours.)

We are unable to find that the appellant presented these points in his motion for a new trial. He cities us to the 10th, 11th, and 12th assignments thereof, but a careful reading of them fails to disclose that the question was raised. The following come closest to it. As to each of said two instructions severally it is complained that "said instruction does not submit the facts and essential elements of an offense against the law and all the facts necessary and essential to constitute the same;" but this is obviously too general.

Again, as to each instruction it is charged "Said instruction is further erroneous in that it authorizes the jury to return a verdict guilty of murder in the first degree against this defendant without requiring the jury to find the homicide was the result of any felonious, premeditated, deliberate, on purpose and of defendant's malice aforethought."

In this last ground some word seems to be left out, or perhaps the word "on" was wrongfully inserted. He would not be inclined to make the appellant forfeit his right to urge the assignment presented here on appeal, merely because of some typographical error in his motion for a new trial; but it seems to us the foregoing language used in the motion indicates his complaint was that the court failed to require the jury to find the homicide was the result of some felonious, etc., intent or purpose. That was his theme throughout the trial, as disclosed by the bill of exceptions, and is the point stressed on this appeal. If the assignment means the instruction failed to require the jury to find the homicide was the result of the arson, it is not well taken, because both instructions do that, as will be seen from the summary of them set out above. It is true neither requires the jury to find the homicide was the *natural and probable* result of the arson; but as we say, there is nothing to show the appellant saved that point in his motion below. For these reasons his contention here with respect to both instructions is overruled.

■ IV. Finally, the assignment of error is made that the trial court refused appellant's requested instructions 28 and 29. Instruction 28 said that even though the jury should find the appellant was guilty of arson, yet such fact would not of itself make him guilty of the alleged crime of murder; and if they should believe the defendant did not intend or expect anyone to be in the building at the time of the fire and that the deceased fireman and others came there after the fire started; and that their appearance constituted a separate

independent and intervening cause producing the death of the fireman, then defendant should be acquitted.

This instruction was properly refused. As we have already ruled, it was immaterial that the appellant did not in fact intend or expect anyone to be in the building at the time of the fire if he reasonably should have anticipated fatal results from his act; and the submission of the question whether the coming of the fireman constituted a separate, independent and intervening cause, amounted to having the jury pass on a pure legal issue.

Instruction 29 in substance said that a person might be guilty of one offense and not guilty of another for which he was on trial; that "the charge" in the instant case was not arson, but that the defendant had "wilfully and intentionally and feloniously killed" the fireman Morris. The instruction then went on to say that the burden of proof was upon the State throughout the trial "to establish said charge and all the ingredients thereof beyond a reasonable doubt, and if upon a consideration of all the evidence a reasonable doubt exists in your minds as to the guilt of the defendant on the charge made, then you must give him the benefit of such doubt and must acquit him."

From what has already been said, we think it will be apparent that the refusal of this instruction was proper. It was misleading, and in effect told the jury they must find the appellant intentionally killed the deceased. In other given instructions the court had several times told the jury they must find the defendant guilty beyond a reasonable doubt before they could convict; and the State's instructions clearly disclosed that the crime with which the appellant stood charged was the murder of the fireman Morris in the perpetration of the arson, and not the arson itself. There was nothing in the instructions as a whole especially calling for the appellant's Instruction 29, and the rejection thereof was not error.

Finding no error in the record, the judgment of the trial court is affirmed. All concur.